Brister et al. (slaves) v. The State.

BRISTER et al. (slaves) vs. THE STATE.

1. Every person indicted for a capital offence, if he is in actual confinement, is entitled to have a copy of the indictment delivered to him at least two entire days before the day appointed for his trial (Code, § 3576) : delivery to his counsel is not sufficient.

But if the defendant objects to going to trial, " on the ground that a copy of the indictment has not been served on him *or his counsel* two entire days before the trial", and it is shown that a copy was delivered *to his counsel* two entire days before the trial, there is no error in overruling the objection, as the form in which it is made is a waiver of the right to personal service if a copy has been delivered to counsel.

When the venue is changed on the defendant's application (Code, § 3615) the certified copy of the indictment becomes so far an original, in the court to which the trial is removed, that a copy of *it*, when delivered to the prisoner, will be a sufficient compliance with the statute, and have the same effect that a copy of the actual original could have.

2. If the transcript furnished by the clerk, on change of venue, is duly certified by him to contain a copy of the caption of the grand jury, the indictment, with all the endorsements thereon, and all the entries and orders made in relation to the cause, including the order for the removal of the trial, as required by the Code (§ 3613), the defendants may be tried on such transcript.

3. Where there is a joint trial under a joint indictment, each defendant may challenge the whole number of jurors to which he would be entitled if tried separately.

4. In criminal prosecutions, neither party can be permitted, except by mutual

consent, to withdraw the trial from the jury to the court by a demurrer to the evidence.

5. A witness who is introduced by the State to prove the defendants' confessions, and who states, on re-examination, "that he had testified to the substance of all that each of said defendants stated on that occasion, but that they may have stated something which he did not recollect", is competent to testify to the confessions, if in themselves admissible.

6. The general rules stated, which should govern the court in deciding upon the competency of confessions, and the jury in determining their credibility and effect after they have been admitted by the court. Distinction also stated between the sphere of the judge and the sphere of the jury.

7. As to the construction of the bill of exceptions, which showed two separate objections by the defendants to the admission of their confessions: It was *held* by a majority of the court, that the last of these objections was so made as to present the question, whether upon the evidence previously set out in the bill of exceptions the confessions were admissible, and that the court below erred in overruling this objection and admitting the confessions; while RICE, J., *dissenting*, held that there was no error shown by the record in overruling either of said objections.

8. Charge of the court on the subject of confessions, and its refusal to charge as requested, held correct.

9. When several defendants are jointly indicted and tried, if there is any evidence against one, the court may overrule the motions of his co-defendants "to introduce him as a witness, on the ground that there was no evidence against him to authorize him to be put on his defence", and "to direct and allow the jury to return a verdict of acquittal as to him, on the ground that there was no sufficient evidence of his guilt to require him further to defend." Code, § 3594.

10. An abstract charge properly refused.

11. If the indictment charges that A gave the mortal blow, and that B and C were present aiding and abetting, while the evidence shows that B struck the blow, and that A and C were present aiding and abetting, this is not a material variance, for the blow is adjudged in law to be the stroke of every one of them.

12. Charges of the court examined and held correct.

13. If the verdict of the jury is received, and read aloud in open court, in the absence of the prisoners, and the jury are then told by the court that they are discharged, it is within the power of the court to call them back before they have left the bar; and if they are immediately recalled, upon the discovery being made that the prisoners are not in court, and the papers in the cause are handed back to them, the prisoners are not deprived of their right to poll the jury, nor can they complain on error of this action of the court.

14. The improper conduct of the jury, after they have retired to make up a verdict, is not a ground for a motion in arrest of judgment.

15. Misconduct of the jury is a ground for a motion for a new trial, but the action of the court in refusing a new trial on that ground is not revisable on error.

ERROR from the Circuit Court of Bibb.

Tried before the Hon. ANDREW B. MOORE.

AT the Spring term, 1853, of the Circuit Court of Perry, an indictment for the murder of one John Rickard was found against the following named slaves, viz., Wash, George, Collins, Brister, Cæsar, Jeff, Bill, John Rodgers, Jerry, John Wallace, and Archer ; the indictment charging that Wash struck the mortal blow. At the same term of the court, a *nolle pros.* was entered as to the defendant Jerry ; the defendants John Wallace, Wash and George were tried, convicted, and sentenced to death ; and the cause was continued as to the other defendants, on their application. At the next term of the court, on the application of the defendants, the venue was changed to Bibb county, where a trial was had at the ensuing Fall term, 1854. Several exceptions were taken to the rulings of the court during the progress of the trial, which are stated in the bill of exceptions as follows :

" The defendants objected to going to trial, on the ground that a copy of the indictment had not been served on them or their counsel, two entire days before the trial ; but it being shown to the court that a copy of the copy of the indictment set out in the transcript sent up by the clerk of the Circuit Court of the county of Perry was delivered by the clerk of the Circuit Court of Bibb to the counsel of said defendants at the last term of this court, the court overruled the objection, and decided that said defendants should go to trial, so far as the said objection was concerned ; and said defendants thereupon excepted.

" All of said defendants further objected to going to trial before the Circuit Court of Bibb county, on the ground that the following transcript did not show that the facts therein set forth did *not* appear of record on the records of the Circuit Court of Perry ; and further, because the clerk showed by his certificate that he was certifying the proceedings in a different case from that shown in the indictment and in said transcript ; and, 3d, that said defendants could not be legally put on their trial on said transcript." The transcript referred to is then set out at length in the bill of exceptions, showing the organization of the grand jury by whom the indictment was found, and containing a copy of the indictment, with the endorsement thereon, and all the orders of the Circuit Court of Perry in relation to the cause ; and appended to it, is the

certificate of the clerk of that court, that it is "a full, true, and perfect transcript of the organization and caption of the grand jury, the indictment, with all the endorsements thereon, and all entries relating thereto, and the order for the removal of the trial, and all other orders in the cause, embracing the recognizances of the State's witnesses, and all other proceedings had by the court aforesaid, in the case of the State of Alabama (plaintiff) against John Wallace, Wash, George, Collins, Cæsar, Brister, Jeff, Bill, John (*alias* John Rodgers), and Archer (*alias* Archie), slaves, as defendants ; all of which appears to us of record." The bill of exceptions then proceeds : " But the court overruled their objections, and all the said defendants excepted.

"In selecting the jury for their trial, after the (*State ?*) had accepted a juror named Walker Fitts, and the defendants Jeff, Cæsar and Brister had acknowledged themselves satisfied, and also accepted him as a juror by whom, with others, to be tried, said juror was challenged by three others of the defendants, viz., Bill, John, and Archer ; and the court, against the objection of said Jeff, Brister, and Cæsar, allowed said challenge, and rejected said juror ; and thereupon said Jeff, Brister, and Cæsar excepted." Eight other jurors, who had been accepted by the State and said Jeff, Brister, and Cæsar, were in like manner rejected by the court on the challenge of the other defendants ; and to each rejection the defendants Jeff, Brister and Cæsar excepted. Six other jurors, who had been accepted by the defendants Bill, Archer, and John, were challenged by the other defendants, and set aside by the court ; and to each rejection the three first-named defendants excepted.

"On the trial of the cause, the following facts appeared in evidence : That the body of John Rickard was found interred in the bank of a ditch in Perry county about the 23d of February, 1853 ; and on examination of it, it was found that two wounds had been inflicted on the side of his head, which had fractured his skull, and produced his death; that he disappeared about the 12th of January, 1853, and was not afterwards seen until his body was discovered, as above stated ; that the deceased was a ditcher by trade, and at the time of his death was engaged in cutting a ditch on the plantation of

Mr. S. F. Pool in Perry county, about twenty feet in width; that he had thirteen negro men (slaves) in his employment as a ditcher, who worked under him in ditching, among whom were the prisoners and three others, viz., John Wallace, Wash, and George, who had heretofore been tried, convicted, and executed for the murder of deceased; that the deceased and said thirteen slaves lived on the plantation aforesaid, and together occupied a cabin thereon, about sixteen feet square, in which they slept at night, and in the centre of which the fires were made; that the deceased was the only white person that staid with or where said slaves were; that some time after he disappeared, suspicions were aroused amongst the neighbors that he had been killed by said slaves, who still continued to work together on the ditch, which deceased was cutting when last seen, under the direction of John Wallace, who was the foreman of the deceased; that by a previous understanding some sixteen or seventeen of the neighbors, some of whom were armed with double-barreled guns, others of them having negro whips commonly used by overseers, and others with sticks, went, about the 23d February, 1853, to the place where said slaves were staying on said Pool's plantation; that one of the company also carried along a' pack of negro dogs, which were known to be such to all the prisoners, Jeff, Cæsar, Brister, and John Rodgers; that at the cabin, where said Rickard had staid, they found one of the boys who was in the employment of Rickard, and that he was placed in charge of the company; that others of the company went down to the ditch, about two hundred and fifty yards from the cabin, where said slaves were at work, and, after getting them all together, took them in custody, the prisoners being included in the number taken; that one or more of said company took each one of said slaves in charge, and in this way they were all marched up to or near said cabin; that Thos. Phillips, one of the company, carried the boy Cæsar to the cabin, and on the way, as said Phillips testified on the trial, he discovered that Cæsar was much alarmed, so much so that he trembled; that Phillips told him not to be alarmed,—that all they had come here for was, to find what had become of old man Rickard; that after the slaves were assembled near said cabin, some of them were tied, and the company then

separated them a short distance from each other, for the purpose of examining them,—the place, however, being open, so that any one of them might see what was being done to the others, and they not being so far separated but that they could hear any blows that might be inflicted on any of them in whipping ; that before they were separated the last time, near the cabin, some one of the company stated in their hearing that they had come to find out what had become of the deceased ; that Phillips again took the boy Cæsar in charge, to examine him, and that he denied all knowledge of the deceased being killed. One of the witnesses, a slave who was a witness on the trial, testified, that according to his best recollection, one of the company commenced whipping Bill, in view of the prisoners Jeff, Brister, Cæsar and John Rodgers, before any confessions were made by any of said slaves except a boy by the name of Ned ; but another witness, a white person who was one of the company, testified, that he did not recollect whether the confessions were made before or after the commencement of the whipping of said slaves.— There was some conflict in the testimony, as to whether the confessions were made before or after the boy Bill Stokely (one of the accused) was whipped. A witness for the State, one J. F. Pool, was then introduced, and testified, that he was one of said company that took up said slaves ; that soon after said slaves were separated near said cabin, and were being examined, it was announced so that said slaves (including said Brister, Jeff, Cæsar, and John Rodgers) could hear it, that the boy Ned confessed ; that said Pool then went to Cæser, and asked him what part he had taken in the murder. Cæsar then, by his counsel, objected to his confessions, made in answer to said question, being received in evidence : but the court overruled the said objection, and allowed said confessions to be received, and said defendant Cæsar excepted. Said Pool then testified, that in answer to said question, Cæsar confessed that a plot had been mentioned to him by John Wallace to kill the deceased, and that he had assented to it,—that he was in the house when the deceased was killed, but was asleep and had no hand in the killing,—and that after deceased was killed he had assisted in conveying him to the grave and burying him. To these con-

fessions, thus obtained, said defendant Cæsar objected, and moved the court to exclude the same from the jury ; but the court overruled the objection, and allowed them to go in evidence to the jury ; and defendant Cæsar excepted."

Said Pool further testified, that he asked each one of the other defendants separately the same question, viz., " What part did you take in the murder of the deceased ?"—that Brister confessed " that John Wallace told him there was a plot to kill the deceased,—that he (Brister) assented to it,—that he was in the house when deceased was killed, but was asleep, and had no hand in the killing,—and that he had assisted in digging the grave for deceased " ; that Jeff confessed, in answer to said question, " that John Wallace had told him there was a plot to kill the deceased,—that he assented to it,—that he was in the house when deceased was killed, but was asleep, and had no hand in the killing,—and that he helped to dig the grave"; that John Rodgers confessed " that John Wallace had told him there was a plot to kill the deceased, and that he had assented to it,—that he was in the house when deceased was killed, but was asleep, and had no hand in the killing,—and that he went with those who carried the deceased to the grave, but did nothing else." Brister, Jeff, and John Rodgers each made the same objections to the admission of their confessions that Cæsar had made, as above stated, and excepted to the ruling of the court in admitting them ; the objections and exceptions of each one being expressed in the same language used in the case of Cæsar in the last paragraph.

" On cross-examination by defendants Brister, Cæsar, Jeff, and John Rodgers, said Pool stated, that in stating the confessions of said defendants he did not pretend to give their language, or that of any one of them—that he used his own language in testifying, and gave his best recollection of the substance of the language used by them ; and thereupon said defendants again severally moved the court to exclude each of their confessions above mentioned from the jury, but the court overruled the several objections, and the defendants severally excepted. Said Pool, on cross-examination, further deposed, that in testifying to the confessions of said Brister, Cæsar, Jeff, and John, he stated the substance of all that he recollected each of said defendants said, according to his best

8

recollection, but that they may have said more, which he does not recollect; and thereupon said defendants again severally moved to exclude their said several confessions, so deposed to by said Pool, but the court severally overruled their motions, and defendants severally excepted. On re-examination said Pool testified, that he had testified to the substance of all that each of said defendants stated on that occasion, but that they may have stated something he did not recollect; that said Brister, Cæsar, Jeff, and John Rodgers all said, when · they made said confessions, that they had nothing to do with killing said deceased, and that he was killed by George and Wash; that Jeff further said, he did not know when the deceased was killed; and that John Rodgers said he did not assist in killing him.

"There was evidence that, when said defendants were taken up, and after said confessions were made, defendants were required by the persons who had taken them up to point out the grave of deceased; and that the persons having them in charge made them turn their backs to the ditch, and took one at a time, and made each one put· a mark on the place which each one severally pointed out as the place of the grave. A witness (Cunningham) testified, that on the morning after the day of the disappearance of the deceased, he went to the ditch where the negroes who had been in charge of the deceased were at work on the ditch, and found all the thirteen slaves which the deceased had had at work with him, except Archer, (including the prisoners,) and then asked the slaves present where Mr. Rickard was, (addressing the crowd, and no one in particular); that they hesitated in giving an answer, and looked at each other, and some one of them told witness to ask John Wallace where he was,—they supposed he could tell where he was. It was shown, also, that John Wallace was Rickard's foreman, and always had charge and control of said slaves in the absence of deceased. Said Cunningham further testified, that he did ask John Wallace, and he said that the deceased had gone to New Orleans. There was no evidence introduced to show that Wash struck ·the blow, or blows, that killed the deceased; and there was no testimony to show that Wash and George were parties to the plot to kill the deceased.

" The testimony in behalf of the State being closed, and before any testimony was introduced by the defendants, the following defendants, to-wit, Archer, Bill, and Jeff, offered to demur severally to the evidence introduced by the State against them severally ; and the court, upon the ground that the court was not bound to take the responsibility of settling and passing upon the testimony, but that the jury should pass on the case, refused to allow said defendants to demur to the said evidence, and to this ruling of the court they severally excepted. The said defendants then severally insisted upon the court passing on their said demurrer to the evidence after all the testimony on both sides was closed ; and the court again declined to dispose of said demurrers, on the ground that the jury should, in all cases, pass upon the testimony, and that the court, in such a case as this, was not bound to do so ; and to this ruling of the court said defendants Archer, Bill, and Jeff severally excepted.

" The defendants Brister, Cæsar, Jeff, and John then proposed to introduce as a witness their co-defendant Archer, on the ground that there was no evidence against him to authorize him to be put upon his defence,—the only evidence against him being that he was on the place when the deceased was killed, and was seen at the cabin where the deceased was killed, on the morning after the night on which the killing took place, about daylight, and was one of the slaves at work with the deceased at the ditch for some days previous to the killing ; and on the day the body was found, the said defendant Archer pointed out the grave, saying, that the place which he pointed out was where the other negroes told him they had buried the old man ; and saying at the same time, that he had no knowledge of the killing, and had no hand or part in it. But the court overruled this motion, and said Cæsar, Brister, Jeff, and John Rodgers severally excepted. These defendants then moved the court (to) direct and allow the jury to return a verdict of acquittal as to their co-defendant Archer, on the ground that there was no sufficient evidence of his guilt to require him further to defend ; which motion the court refused, and said defendants (Cæsar, Brister, Jeff, and John Rodgers) excepted.

" The defendants requested the court to charge the jury—

" 1. That, if they believed the slaves John Wallace, George, and Wash killed the deceased, and that the accused worked with them from that time until they were taken up, and that there were others of said slaves who had not been charged with the murder of the deceased, and who knew where his grave was and pointed it out, and who also worked with the accused,—that these facts might account for the accused knowing where the grave was, because they might have been told where it was; which charge the court refused, and said Cæsar, Brister, Jeff, and John Rodgers severally excepted.

" 2. That, if the jury cannot determine, beyond a reasonable doubt, that the confessions made by Brister, Cæsar, Jeff, and John Rodgers to Mr. Pool were made before Bill (one of the defendants) was whipped,—then they must exclude their confessions from their consideration entirely ; which charge the court refused, and said Cæsar, Brister, Jeff, and John Rodgers severally excepted. The court, after refusing said charge, stated to the jury, that they might look to any other facts in the case to solve this doubt.

" 3. That under the indictment in this case, if there was no evidence that the boy Wash struck the blow, or blows, the jury must find the defendants not guilty ; which charge the court refused, and the defendants all severally excepted.

" 4. That under the indictment in this case, if the jury cannot determine from the evidence whether John Wallace, George, or Wash struck the blow or blows which produced the death of the deceased, they must find the defendants not guilty ; which charge the court refused, and the defendants Cæsar, Brister, Jeff, and John Rodgers severally excepted.

" 5. That, if there was no evidence that Wash and George were parties to the plot to kill the deceased, and if they were satisfied from the testimony that Wash and George did kill the deceased, then they could not find the defendants guilty ; which charge the court refused, and defendants severally excepted.

" The court charged the jury—

" 1. That, if they found that Cunningham, on the morning after the deceased disappeared, went to the ditch, and inquired of the slaves there for the deceased, and they hesitated or failed to answer him that question, and that the prisoners

Brister et al. (slaves) v. The State.

were present when the said question was asked,—they might take that as a circumstance tending to show their guilt; to which charge the defendants severally excepted.

" 2. That the true test is, whether you believe the confessions true or not; and if you believe them to be true, the State must have the benefit of them as evidence. The defendants severally excepted to this charge.

" 3. That they might believe one part of the confessions, and reject the other, and might look to all the circumstances connected with the case to ascertain whether the whole, or only a part, was true; and to this charge the defendants severally excepted.

" 4. That, if they believed the defendants were present, and encouraged another to commit the murder, they were as guilty as if they struck the blow, and concealment of the crime, if they knew it had been committed, is a circumstance for the consideration of the jury as to their guilt; and to this charge the defendants severally excepted.

" After the jury had retired to consider their verdict, the defendants Brister, Cæsar, Jeff, and John Rodgers were remanded to jail, and while in jail the jury returned into court; and on being asked if they had agreed upon a verdict, replied through their foreman that they had. The court then directed the clerk to receive and read the verdict, and the clerk received and read it aloud accordingly, in the presence of the court and a large number of by-standers; the prisoners Brister, Cæsar, Jeff, and John Rodgers not being in court at the time, and being in jail. The court then observed to the jury, that they were discharged, and the jury started out of the court-room, but had not got out of the bar. It was then discovered that the prisoners were not in court, and the court immediately stated to the jury that they were not discharged; and ordered the clerk to hand the papers in the cause back to them, and directed the sheriff to bring the said prisoners into court. When the prisoners were brought into court, they objected to the clerk receiving the verdict of the jury, on the ground that the verdict had been received by the court and read aloud in their absence, and that they had been deprived of their right to have the jury polled. But the court overruled the objection, received said verdict, and ordered the

same to be read in the presence of the said prisoners; which was done accordingly, and said prisoners excepted."

The defendants Brister, Cæsar, Jeff, and John Rodgers then moved the court, 1st, to set aside the verdict of the jury; 2d, "that they be discharged, the verdict of the jury being received in their absence"; 3d, in arrest of judgment; and, 4th, for a new trial. In support of these several motions, they relied on the facts above stated in reference to the verdict being received in their absence, and also introduced evidence of the misconduct of some of the jury while considering their verdict, in separating from each other without the charge of an officer, and in conversing with other persons; but upon all the evidence, which it is unnecessary to state at length, the court overruled each motion, and the defendants severally excepted to each ruling of the court.

The jury returned a verdict of guilty against the defendants Cæsar, Brister, Jeff, and John Rodgers, and not guilty as to Bill and Archer; and the court thereupon pronounced sentence of death on the four first-named, but ordered the execution to be suspended until the decision of the Supreme Court could be had upon the points reserved by the bill of exceptions, all of which are now assigned for error.

I. W. GARROTT, with whom was J. R. JOHN, for the plaintiffs in error:

I. The Code, (§ 3576,) and also Clay's Digest, (p. 459, § 53,) require that a copy of the indictment shall be served on the prisoner, if in custody. In this case, it was served on the counsel, not of record, or the same who appeared for the defence at the trial, so far as the transcript discloses.

II. The confessions were obtained under circumstances, a bare recital of which is sufficient to show that they ought not to have been admitted. The defendants are slaves,—were on the plantation of S. F. Pool, without any white person near them to whom to look for protection,—were taken into custody by sixteen or seventeen white men, who went on the place armed with double-barreled guns, negro whips and sticks, and accompanied by a pack of negro dogs, known to be such by defendants. They were told what these white men had come for—viz., to find out what had become of the

old man Rickard ; they were separated for examination, but kept in custody, and some of them were tied, and so near that each could see and hear what was done to the others ; it was announced in their hearing that one had confessed, and then the witness approaches each one of the defendants and asks him, " What part did you take in the murder ?" (thereby assuming his guilt). If to all this it be added, that it was proved or even left doubtful that one of the number was whipped before the confessions were made, it is too clear for argument that defendants confessed under the " torture of fear," or rather, under the fear of torture.  It is not surprising that one of these unprotected slaves was so terrified at this formidable display of men and things most dreaded by them, that he actually " trembled" ; and to hold that a confession drawn from this defendant, quaking with fear and agony at what he saw and heard, would be equivalent to holding that no amount of fear which could exist in the mind, should render confessions extracted under its influence illegal.—Wyatt v. The State, 25 Ala. 9 ; 1 Green. Ev., §§ 214, 219, 222, 225 ; 3 Ph. Ev., (C. & H. Notes), part 1, 429, note 259.

2. It was incumbent on the State to show that the confessions were voluntary,—not on the defendants to show that they were not.  One witness testified that the whipping commenced before the confessions were made ; another (a white person) that he could not say whether the whipping commenced before or after the confessions.  This doubt, even under the circumstances, was sufficient to require the exclusion of these confessions.—Wyatt v. The State, supra ; 1 Green. Ev. 219.

III. Confessions, like all other admissions, when attempted to be detailed, must be fully deposed to.  Part cannot be given, and part not.  The precise language used must be given, if possible ; if not, then the substance of all that was said must be stated by the witness.—Davis v. The State, 17 Ala. 354, (357-8) ; Dennis & Strickland v. Chapman, 19 ib. 29 ; 1 Green. Evidence, §§ 218, 214 ; 3 Ph. Ev., (C. & H. Notes,) 425.

The testimony of Pool, as to the confessions, falls far short of this.  He says, that he does not " pretend" to give the language of defendants, or the language of any one of them; that

"he stated the substance of all he recollected that each defendant said, according to his best recollection, but that they may have said more which he did not recollect" (p. 14-15). How vague! He does not pretend to use defendants' language, nor does he give the substance of all they said, but only the substance of all, or so much as he recollected. How much may he have forgotten! He himself admits that they may have said more than he detailed, and which he did not recollect. If such testimony is admissible, then the lives of men are dependent, not on what they may admit or confess, but on the imperfections and frailties of those who hear them, and who judge and pass on what they suppose to be the substance of what is said, and then detail so much of that as they happen to recollect.

IV. The defendants had a right, by demurring to the evidence, to withdraw their case from the jury, and throw themselves upon the judgment of the court. The constitutional right to be tried by a jury is secured to every citizen, and if a defendant is disposed to waive this right, the tribunal before which he is tried has no right to decline to pass on his case, and to force him before a jury by whom he is not willing to be tried, and who may be influenced by prejudices which are supposed never to reach the bench.

V. There was no evidence against Archer that could raise even a suspicion of his guilt, and under section 2288 of the Code, he ought to have been admitted as a witness.

VI. The circumstance that defendants pointed out the grave of deceased having been introduced against them, the defendants sought to explain by showing that they might have obtained their information from others with whom they had for some time associated and who had knowledge of these facts. But the court, by refusing the first charge asked for, in effect asserted that this knowledge of the accused could not be thus accounted for. This was wrong.—3 Ph. Ev., (C. & H. Notes), part 1, p. 417; The State v. Guild, 5 Hals. 188.

VII. As the court, on the preliminary examination, declined to exclude the confessions of defendants, then the question ought to have been referred to the jury, and the court should have charged them that, if they believed that the confessions were improperly obtained, they should disregard them.—The

State v. Guild, 5 Halstead, 188 ; 3 Ph. Ev., (C. & H. Notes,) part 1, p. 423-4, 429, 301 ; 5 Pick. 477, (496).

VIII. The indictment charges that defendants and others, including boy Wash, with a club-axe, which Wash then held in both his hands, killed deceased. There was (says the bill of exceptions,) no evidence to show that Wash struck the blow ; and the court was asked, and refused to charge, that if this material averment in the indictment was not proved, that they must find defendants not guilty. That it is material, is shown in 1 Archb. Cr. Pl. 89, (2), note 2.

IX. There was no evidence (page 16) that Wash and George were parties to the plot to kill deceased. The plot, so far as the proof shows, was between John Wallace and defendants. The proof shows that Wash and George did the killing. The refusal of the court to give the last charge, therefore, asserted the preposterous position, that if defendants and John Wallace conspired to kill deceased, and afterwards Wash and George, having nothing to do with this plot, killed the deceased, then the defendants are guilty ; in other words, if defendants and John Wallace conspired to kill deceased, but did not do it, and some other person with whom they had no connection did it, then defendants are as guilty as if they themselves had done the killing.

X. The first charge given at the instance of the State, (page 18,) cannot be sustained. The fact that Cunningham addressed a crowd of thirteen slaves, the defendants being among them, and that defendants, who do not seem to have been in part or in any way called on to answer, "hesitated," or failed to answer, surely ought not to be used against them. They had a foreman who was their spokesman, and it was natural that they should refer to him, as the proof shows they did, to answer the question.

XI. The last charge asked for is abstract and calculated to mislead the jury. There was no evidence to show that defendants were present, in legal sense, and encouraged the striking of the blow. The proof shows that most of them were asleep, where they were bound to be ; and if asleep, they could not encourage the deed. Nor was there any evidence to show any act of concealment of the crime. The bare fact that one does not tell what he knows, cannot be held to make

him responsible for all acts of which he has information.

XII. The second charge given, at the instance of the State, is also erroneous,—because the true test as to confessions is not whether they are true or not, but whether properly obtained or not. If the position asserted in the charge be correct, confessions obtained on the rack would be admissible.

XIII. The dispersion of the jury vitiated their verdict.—People v. Douglas, 4 Cowen 26, (38) ; Smith v. Thompson, 1 ib. 221, note a, p. 235-6-7 ; Woods v. Hart, 3 Caines' R. 95 ; Dana v. Roberts, 1 Root's (Conn.) 134 ; Oliver v. Trustees of Presby. Ch. of Springfield, 5 Cowen 283.

2. The presumption is that injury results from the dispersion of the jury, and it must be shown affirmatively that injury did not result, or the verdict will be set aside.—McCann v. The State, 9 S. & M. 465, (467) ; Hines v. The State, 8 Humph. 597, (9 U. S. D. 343, §§ 21, 22) ; Boles v. The State, 13 S. & M. 398, 401-2 ; Durfee v. Eveland, 8 Barb. Sup. C. R. 46 ; Overbee v. Commonwealth, 1 Rob. (Va.) 756 ; 1 Archb. 178-19, (note), where the authorities are collated.

XIV. Verdict cannot be rendered in the absence of the prisoner.—The State v. Hughes, 2 Ala. 102 ; 2 Hawkins 619, § 2 ; Rex v. Landsingham, 1 Raym. 193.

XV. It is the duty of the court to keep the jury together, and if it fails, then it commits an error,—because it has not complied with what the law imposes as a duty. This is matter which can be reached by writ of error, apart from all considerations of motions in arrest of judgment, new trial, &c.

P. T. Sayre, for the Attorney General, contra :

1. After a change of venue, it was too late for the defendants to raise the objection that a copy of the indictment had not been served on them.—State v. Williams, 3 Stew. 463. This decision was made upon a statute clothed in the same language with that used in the Code.—Toulmin's Laws of Ala. ; Aik. Digest. The action of the court will be presumed to have been regular.—Morris v. The State, 25 Ala. 59.

2. But the record shows that a copy was served on the defendants' counsel, and this is sufficient; for two reasons—1st, because such has been the general practice of the State, which the court will judicially recognize (Millard's Adm'r v. Hall,

24 Ala. 224) ; and, 2d, because the party is bound by the acts of his counsel : whatever is " done by him in the pendency of a cause, is considered as done by authority of his client, and is binding on him."—2 Md. Ch. Dec. 143 ; *ib.* 425 ; 13 U. S. Digest, p. 67, § 6 ; Lewis v. Sumner, 13 Metcalf's R. 269 ; Courcy v. Brenham, 1 La. Ann. R. 397 ; Flake & Freeman v. Day & Co., 22 Ala. 132 ; 4 Ired. Eq. 485 ; 3 Dev. 62 ; 6 How. (U. S.) 106 ; 3 Cranch, 297 ; 1 Burr. 59 ; 11 Ala. 820.

3. There was no error in allowing to each defendant his peremptory challenges.—Hawkins v. The State, 9 Ala. 141 ; Bixbe v. The State, 6 Ohio R. 86.

4. It was a matter of discretion with the court, whether or not to direct an acquittal as to Archer ; and its action cannot be reviewed on error.—The State v. McLendon, 5 Strobh. 87 ; 2 U. S. Digest, p. 533, § 347 ; Code, §§ 3594–5.

5. It is conceded, that a defendant, in a capital case, has the right to be present when the verdict is rendered ; but in this case, the defendants had the substantial benefit of that right. The mere fact that the jury handed the verdict to the clerk, by whom it was read aloud in the absence of the prisoners, did not injuriously affect them, if by such action they lost no right which then existed. The record shows that the irregularity was discovered before the actual dispersal of the jury ; and that the jury was immediately recalled, and the verdict rendered in the presence of the prisoners. The order dismissing the jury was a judicial act which could be set aside so long as the jury remained within the control of the court. But, even if the action of the court was erroneous, the prisoners were not on that account entitled to their discharge. The State v. Hughes, 2 Ala. 102 ; The State v. Battle, 7 *ib.* 259.

6. The court properly refused to allow the defendants to demur to the evidence. In all the prosecutions by indictment or information, the constitution (Art. I, §§ 10, 28) is mandatory that the trial shall be by jury. These defendants could only be tried by indictment, and an indictment can only be found by a grand jury. It is plain that a party could not, by appearing in court, admitting his guilt, and waiving the indictment, subject himself to punishment ; because the constitution is imperative, that an indictment shall first be found,

to give the court jurisdiction ; and after the indictment is found, it is equally imperative as to the mode of trial. If the indictment, then, cannot be waived, no reason is perceived why a waiver of trial by jury could be made.—Doss v. Commonwealth, 1 Gratt. 557.

7. The rule as to confessions, whether made by white persons or by slaves, is the same.—Clarissa v. The State, 11 Ala. 62. That they are slaves, and ignorant, are facts for the consideration of the jury in weighing the testimony.—Seaborn and Jim v. The State, 20 Ala. 18. The confessions must be freely and voluntarily made, and uninfluenced by promises or threats ; and they are sometimes rejected, when made in response to a question which assumes the party's guilt. But the mere fact that the parties are in custody, will not exclude confessions.—Seaborn and Jim v. The State, 20 Ala. 18 ; Wyatt v. The State, 25 *ib.* 12 ; Spence v. The State, 17 *ib.* 197 ; Carroll v. The State, 23 *ib.* 28. The negroes in this case, it is true, were all arrested, by men who were armed ; but no threats or promises were made : on the contrary, it was announced in the presence of the negroes, that they need not be alarmed,—that the party had only come to find out what had become of Rickard. The only hypothesis, upon which the confessions can possibly be excluded, is, that they were made after the boy Bill had been whipped. This fact, however, must affirmatively appear. One witness swears, that according to his best recollection, they were made after the whipping ; while another witness is unable to remember which occurred first ; and the bill of exceptions says, "there was some conflict of testimony" on that point. The rule is, that the bill of exceptions must be construed most strongly against the party excepting ; and it is evident from the language here used, that there was other evidence on that point not set out in the record. For the purpose, then, of sustaining the judgment of the court, it will be intended that there was evidence sufficient upon which to predicate the ruling of the court. The question propounded by the witness Pool to each one of the prisoners, did not assume the guilt of the party addressed : it was tantamount to asking whether he had taken any part in the murder. All the other cases decided in this State, in which confessions have been ruled out on the

ground that they were made in answer to questions assuming guilt, were based on the fact that the question assumed guilt affirmatively, and on the principle that the slave could not deny the assertion of the master.—Clarissa v. The State, 11 Ala. 62. In this case, no guilt is assumed, but the party is left to make such answer as his feelings might prompt. The case of Clarissa is not regarded as authoritative, and the true rule is laid down in Carroll's case, 23 Ala. 28.

RICE, J.—The indictment is for a capital offence, and was found in the Circuit Court of Perry, against the plaintiffs in error and divers other slaves. The trial of the plaintiffs in error, on their application, was removed to the Circuit Court of Bibb, under the provisions of sections 3608 to 3616 inclusive of the Code. These plaintiffs have been in actual confinement ever since the indictment was found. When they were brought into the Circuit Court of Bibb for trial, they objected to going to trial, " on the ground that a copy of the indictment had not been served on them or their counsel two entire days before the trial." But it being shown to the court that a copy of the copy of the indictment set out in the transcript sent up by the clerk of the Circuit Court of Perry was delivered by the clerk of the Circuit Court of Bibb to the counsel of the plaintiffs in error at the preceding term of the Circuit Court of Bibb, the court overruled the objection, and the plaintiffs in error excepted.

If the ground of objection had been, that a copy of the indictment had not been delivered to them two entire days before the trial, and no other proof of delivery had been adduced than that above shown, we should, without hesitation, have reversed the judgment; for the right is conferred, by section 3576 of the Code, upon every person indicted for a capital offence, if he is in actual confinement, to have a copy of the indictment delivered to *him* at least two entire days before the day appointed for his trial.—The United States v. Curtis, 4 Mason's Rep. 232 ; Smith's Com. on Stat., pp. 685-6. But our duties as a court for the correction of errors committed by inferior tribunals are defined by law, and confine our examination to the action of the court below upon the objection as there made. We cannot allow to the prisoners the benefit

of an objection they did not make below, and of which they deprived themselves by the objection which they did make.

The rule is, that we can indulge no presumption adverse to the correctness of the action of the primary court, but must make all intendments in its favor not inconsistent with the record.—Morris v. The State, 25 Ala. 57. We cannot, therefore, know or say that the court below would not have sustained the objection, if the ground of objection had been that a copy of the indictment had not been delivered to the prisoners two entire days before the trial.. The form in which the ground of objection was stated—"that a copy of the indictment had not been served *on them or their counsel* two entire days before the trial"—was treated by the court below as a waiver of the right of the prisoners to have a copy delivered to them, if a copy had been served on their counsel two entire days before. the trial ; and therefore, on proof being made to the court that a copy had been delivered to their counsel by the clerk more than two days before the trial, the court overruled the objection *as made by the prisoners.* We cannot decide that the court erred in this. *Non constat,* the State might have proved a delivery of a copy to the prisoners themselves, more than two days before the trial, if the objection had been put on the ground that a copy had not so been delivered to them. They relieved the State from the necessity of making such proof, by placing their objection on the ground selected by themselves.—93d Maxim in Law Grammar, p. 76.

When the trial of such a case as this is removed, as this was, section 3615 of the Code provides, that the prisoners "must be tried on the copy of the indictment", certified in the manner directed by section 3613. In such case, the copy so certified becomes so far an original, in the court to which the trial is removed, that a copy of such copy when delivered to the prisoners will have all the effect that a delivery of a copy of the actual original could have.

2. The transcript furnished by the clerk of the Circuit Court of Perry in this case, to the Circuit Court of Bibb, duly certifies a copy of the caption of the grand jury, the indictment, with the endorsements thereon, and all entries relating thereto, and the order for the removal of the trial, and

Brister et al. (slaves) v. The State.

all other orders in the cause, as required by section 3613 of the Code. There was no error in overruling the objection made by the prisoners to going to trial before the Circuit Court of Bibb on said transcript.

3. In Hawkins v. The State, 9 Ala. 137, it was decided, that if there is a joint indictment, and joint trial of several persons, each may challenge the whole number of jurors to which he would be entitled if tried separately ; and that no man ought to sit as a juror, upon a joint trial, who was not, in the estimation of all the prisoners, indifferent as to all. This decision is sustained by high authority, and is fully approved by us. There is, therefore, no error in the rulings of the court below as to the challenge of jurors.

4. It has been long settled in England, that in a criminal prosecution, the crown officer is not bound to join in a demurrer to evidence tendered by the defendant.—1 Chitty's Crim. Law 623 (mar. page). The right of a prisoner to compel the State to join in a demurrer to evidence is not given by the common law, or by statute, or by the constitution ; and we hold, (as the General Court of Virginia has heretofore held,) that neither the State nor the party accused can be permitted, except by mutual consent, to withdraw, by a demurrer to evidence, the trial of the cause from the jury to the court. Doss v. The Commonwealth, 1 Gratt. R. 557.

5. Where the court commits an error by admitting evidence, which, at the time of its admission, was not admissible, such error is cured, if the record affirmatively shows that the evidence so admitted became admissible by reason of other testimony subsequently introduced.—Lawson v. The State, 20 Ala. 65. This principle disposes of the several exceptions taken by the prisoners during their cross-examination of the witness Pool,—provided the confessions of the prisoners (if proved literally) do not appear to us to have been inadmissible confessions ; which is a matter we shall examine as soon as we add a few words relating to the exceptions last above named.

The record shows, that, " on re-examination, said Pool testified, that he had testified to the substance of all that each of said defendants stated on that occasion, but that they may have stated something that he did not recollect." This was as much as the law exacted, to entitle him as a witness to

testify to any voluntary and admissible confessions of the prisoners; and all the exceptions taken to the testimony of Pool are unavailing to the prisoners, unless the record shows us that the confessions of the prisoners are such as the law rejects.

6. We now proceed to the consideration of the important subject of confessions. We shall treat it with becoming caution, and shall confine ourselves as much as possible to the language used by what we deem the highest and best authorities on the subject.

In the first place, we shall state the general rules which should govern the judge in deciding upon the competency—the admissibility of confessions.

Before any confession can be received in evidence, in a criminal case, it must be shown that it was voluntary—that is, that it was made without the appliances of hope or fear, by any other person. Whether it was so made or not, it is for the judge (before he admits it) to determine, upon consideration of the age, condition, situation and character of the prisoner, and the circumstances under which it was made. The material inquiry is, whether the confession has been obtained by the influence of hope or fear, applied by a third person to the prisoner's mind.—1 Greenl. Ev., § 219; Wyatt v. The State, 25 Ala. 9; Spence v. The State, 17 ib. 197; Seaborn and Jim v. The State, 20 ib. 15.

But all the foregoing must be taken subject to the qualification necessarily implied from the existence of a certain other well-settled rule, in substance as follows: Although, by the flattery of hope, or by the torture of fear, information has been obtained from the prisoner, yet, if *in consequence of such information so obtained from him, the body of the person murdered, or any other material fact, is discovered*, it is competent to show that such discovery was made conformably with the information given by the prisoner, and to show that he stated that the thing would be found at a particular place, and to prove that it was accordingly so found; for the statement as to his knowledge of the place where the body or other evidence was to be found, being thus confirmed by the fact, is proved not to have been *fabricated* in consequence of *any inducement or influence*. And this coincidence between his statement and

the thing discovered is a matter which the law will not with-hold from a jury.   This rule, and its limitation, will be found in 1 Greenl. Ev., § 231; see, also, 2 Phil. Ev. 249, note 226 ; 2 Russ. on Crimes, (ed. 1853,) pp. 862-3.

Where promises or threats have been used, yet, if it appear to the satisfaction of the judge that *their influence was totally done away* before the confession was made, the evidence will be received.—1 Greenl. Ev., § 221.

In the next place, we shall state the rules which should govern the parties and the jury after confessions have been admitted by the judge.

Whenever a confession is admitted by the court, the jury must take it:  they cannot reject it as *incompetent* :  they are confined to its *credibility* and *effect*.

Either party has the right to prove *to the jury* the same facts and circumstances which were legally proved to the court when it was called upon to decide the question of com-petency, and all other circumstances applicable to the con-fession or having any legal bearing on its credibility or effect ; and if, in view of all the facts and circumstances proved, the jury entertain a reasonable doubt as to the truth of the con-fession, they may disregard it, in their decision of the case, as being *incredible*, although they cannot reject it as *incompetent*. The Commonwealth v. Dillon, 4 Dallas 116 ;  Commonwealth v. Knapp, 10 Pick. 477-496 ;  State v. Guild, 5 Halst. 163 ; 2 Phil. Ev. 235-240, notes 205 and 207.   If they entertain no such reasonable doubt, they ought not to disregard it, although they may believe it was obtained by the appliances of hope or fear to the mind of the prisoner.

The rules above laid down recognize the sphere of the judge and the sphere of the jury as distinct ; and, whilst they pre-vent the jury from invading the province of the judge, they alike prevent him from invading their province.  These rules, also, preserve the great safeguard thrown around every per-son charged with crime—the right to claim at the hands of a jury the benefit of every reasonable doubt arising from the evidence.

7. A majority of the court are of opinion, that the confess-ions in this case, under the previous decisions of this court, were improperly received, and that the motion to exclude

them from the jury, which says, "to these confessions, thus obtained, the prisoners objected, and moved to exclude", &c., must be considered as referring to the preceding proof show-ing the manner in which the confessions were obtained. They are of opinion, that, although the bill of exceptions fails to set forth all the proof, yet it shows that the decision of the court was predicated upon that which is set out; and as enough proof is set out to put the court in error, if there was other proof, it was the duty of the court to set itself right by setting it out.

In my opinion, the prisoners having objected to the con-fessions, as being elicited by a question assuming their guilt, viz., "What part did you take in the murder?" and this ob-jection having been overruled, and the confessions admitted in evidence, the objection and motion to exclude immediately following—namely, "to these confessions, thus obtained," &c.,—refers to their being obtained as previously stated by the preceding objection—that is, in answer to what the counsel supposed to be an improper question assuming their guilt. I think the bill of exceptions fairly admits of this construction, and as it sustains the judgment, (Carroll v. The State, 23 Ala. 28,) numerous decisions of this court require that we should so construe it. I do not think enough is shown in the record to put the court below in error.

8. In this connection, it is proper to say, that it follows from the rules above stated, that there was no error in the second charge given by the court, nor in refusing the second charge asked by the prisoners. If this second charge asked had been given, the jury would have been thereby forced to "exclude their confessions from their consideration entirely", although they were convinced beyond a reasonable doubt that the confessions were true,—merely because they could not de-termine beyond a reasonable doubt that the confessions were made before the slave Bill was whipped.

9. There was some evidence against the slave Archer, who was put upon his trial with the plaintiffs in error. The jury might have believed that part which tended to fix guilt upon him, and have disbelieved that part which tended to excul-pate him. There was no error in overruling the several mo-tions of the prisoners, which were made for the purpose of

enabling them to use their co-defendant Archer as a witness for them.—Code, § 3594.

10. The bill of exceptions fails to show that there was any one of the thirteen slaves who were living and working with deceased when he was killed, who had not been charged with his murder; and it also fails to show that any of said thirteen slaves, except the plaintiffs in error and Archer, knew where the grave of the deceased was and had pointed it out. The first charge asked by the prisoners assumes that there was evidence of these facts. There was no error in refusing that charge, for it was abstract, and not authorized by the evidence. Waters v. Spencer, 22 Ala. 460; Brooks v. Hildreth, *ib.* 469; Swallow v. The State, *ib.* 20; Carey v. Hughes, 17 *ib.* 388.

11. If the indictment charges that A gave the mortal blow, and that B and C were present, aiding and abetting, &c., but on the evidence it appears that B struck, and that A and C were present, aiding and abetting, &c., this is not a material variance; for the stroke is adjudged in law to be the stroke of every one of them, and is as strongly the act of the others as if they all had held the weapon, and had all together struck the deceased.—2 Russ. on Crimes, (ed. 1853,) pp. 793-4; 2 Hale's P. C. 292. Therefore, there was no error in refusing the third, fourth, and fifth charges asked by the prisoners.— Rex v. MacAlly, 9 Rep. 67; Sauchar's case, *ib.* 119 a.

The fifth charge asked is liable to another insuperable objection: it assumes it to be law, that although the prisoners may have been parties to the plot to kill the deceased, and although they may have been present, aiding and abetting and encouraging Wash and George in the murder, yet, if Wash and George did the killing, and were not parties to the plot, the prisoners must be totally exonerated from the guilt of the murder, merely because Wash and George were not *parties to the plot*.

12. We have carefully examined the first, third and fourth charges given by the court, and are satisfied there was no error in giving them.—See the authorities above cited; and Johnson v. The State, 17 Ala. 618; Campbell v. The State, 23 *ib.* 28; Smith v. The State, 9 *ib.* 990.

13. The rule of law is undoubted, that one tried for a crime has a right to be present when the jury return their verdict

against him. But the reason—the only reason—of this rule is, that he may examine them by the poll, to ascertain if they assent to his conviction.—The State v. Hughes, 2 Ala. 102. When it is clear that the reason of this rule has been fully satisfied, the rule itself is satisfied. When the jury returned with their verdict in this case, and announced that they had agreed, the prisoners were not in court, but in jail. But the court, not knowing this, directed the clerk to receive and read the verdict, and the clerk did read it aloud in the presence of the court and a large number of bystanders. "The court then observed to the jury, that they were discharged, and the jury started out of the court-room, but had not got out of the bar. It was then discovered, that the prisoners were not in court, and the court immediately stated to the jury, they were not discharged, and ordered the clerk to hand the papers in the cause back to them, and directed the sheriff to bring the prisoners into court. When the prisoners were brought into court, they objected to the court's receiving the verdict of the jury, on the ground that the verdict had been received by the court and read aloud in their absence, and that they had been deprived of their right to have the jury polled; but the court overruled the objection, received said verdict, and ordered the same to read in the presence of the said prisoners; which was done accordingly, and said prisoners excepted."

Upon these facts, we hold that the jury were not discharged, in legal contemplation, by the occurrences which transpired in the absence of the prisoners. The observation of the court to the jury, that they were discharged, was revocable by the court for a time, and was revoked in due time. The revocation was in time, because it was almost instantaneous and whilst the jury, *as a body*, were still continuing to be in the bar, and in the presence and power of the court. This revocation being in time, we think the court had the power to return the papers in the cause to the jury, and to do what it then proceeded to do. Such a course of proceeding did not deprive the prisoners of the right nor the opportunity to examine the jury by the poll. There is nothing sound in the argument that the right to poll was prejudiced by the fact that the verdict had been previously read aloud in court; for

the right to poll the jury cannot be exercised in any case until the verdict has been read aloud in court.—2 Hale's P. C. 299-300.

14. The improper conduct of a jury, after they have retired to make up a verdict, is not a ground for a motion in arrest of judgment.—McCann v. The State, 9 Sm. & Mar. 465; 1 Waterman's Archb. Cr. Pl. 178-31, and note (2).

15. Misconduct of a jury is a ground for motion for a new trial.—Wharton's Cr. Law 895; Waterman's Archb. Cr. Pl. 178-19. But it is too firmly settled in this State now to be questioned, that this court cannot revise the action of the Circuit Court refusing a new trial.

We have carefully deliberated upon every question presented by the record, and the result is, that while I think the judgment and sentence should be affirmed, my brethren believe there is error in admitting the confessions; and for that error the judgment and sentence pronounced in the court below must be reversed, and the cause remanded.