# REPORTS

OF

# CASES ARGUED AND DETERMINED

## AT JUNE TERM, 1860.

36  211
97  27
36  211
106  56

## MOSE (A SLAVE) vs. THE STATE.

[INDICTMENT FOR MURDER.]

1. *Entering plea of not guilty for prisoner.*—Where a prisoner, having been duly arraigned, and having pleaded not guilty on his first trial, refuses to plead anew on a second trial, the court may cause the plea of not guilty to be entered for him.

2. *Change of venue.*—The statute authorizing a change of venue in a criminal case, (Code, § 3008,) applies to and includes slaves.

3. *Admissibility of confessions.*—Where a witness testifies, that he went to see the prisoner, after his arrest, at the instance and request of the latter, and found him confined and chained; that in reply to an inquiry why he had sent for him, the prisoner referred to an informal preliminary examination, at which the witness had assisted, admitted that his denial of guilt on that occasion was false, and proceeded to confess his guilt;· and that he did not know of any promises or threats previously made to the prisoner,—this is sufficient, *prima facie*, to show that the confessions were voluntary, and to authorize their admission as evidence before the jury.

4. *Same.*—The confessions of the prisoner in this case, who was a slave, held to have been properly received in evidence under the facts disclosed in the record, notwithstanding promises of favor made by his master several weeks previously, and threats of vio-

lence by third persons on the day before such confessions were made.

5. *Withdrawal of jury pending preliminary investigation by court touching admissibility of confessions.*—There is no rule of law, which requires that, pending the preliminary investigation by the court as to the competency and admissibility of confessions, the jury should be made to withdraw : if a case should arise, in which the ends of justice demanded that such a course should be pursued, an appeal must be made to the enlightened discretion of the presiding judge.

6. *Relevancy of evidence corroborating confessions of prisoner and dying declarations of deceased.*—The fact that a buckshot, of the size admitted by the prisoner to have been used by him in shooting the deceased, was found a month afterwards, lodged in a tree near the scene of the murder, within the range of a gun discharged under the circumstances detailed in the dying declarations of the deceased and in the confessions of the prisoner, is relevant evidence, as corroborating those declarations and confessions.

7. *Mode of impeaching or sustaining character of slave witness.*—Where the general character of a slave for truth and veracity is in issue, a witness who is acquainted with his character in the family in which he lives, "consisting of seven or eight whites and about fifty blacks," is competent to testify.

8. *Same.*—But a witness who states, on cross-examination, " that what he meant by general character was the way he conducted himself, what his own master said, and what he himself knew of him," is not competent to testify to the character of such slave.

9. *Charge on sufficiency of evidence.*—A charge to the jury, instructing them that they must find the prisoner not guilty, "unless the evidence against him was such as to exclude to a moral certainty every supposition (or hypothesis) but that of his guilt," asserts a correct legal proposition, and ought to be given at the request of the prisoner.

10. *Same.*—But a charge which asserts that he is entitled to an acquittal, "unless the evidence against him was such as to exclude to a moral certainty every *possible* hypothesis but that of his guilt," is erroneous.

11. *Weight of confessions as evidence.*—The *corpus delicti* being otherwise established, a conviction may be had on the prisoner's confessions alone, if free, voluntary, and satisfactorily proved.

FROM the Circuit Court of Perry.

Tried before the Hon. PORTER KING.

THE indictment in this case was found at the fall term, 1858, of the circuit court of Dallas, and charged the prisoner, Mose, *alias* Moses, a slave, with the murder of

Martin Oaks, a white person. The prisoner was arraigned at the same term, and pleaded not guilty; and, on a sub-sequent day of the term, on his application, the venue was changed to Perry county, where, at the fall term, 1859, he was tried and convicted; but the judgment of conviction was reversed by this court, at its January term, 1860, and the cause remanded.—See the case reported in 35 Ala. 421. At the spring term, 1860, of said circuit court of Perry, as the bill of exceptions in the present record shows, " when the case came on to be heard, the defendant announced himself ready for trial, on his plea of not guilty, pleaded in Dallas circuit court before the venue was changed. The court required him to plead over to said indictment, but he declined to do so; and the court thereupon entered the plea of not guilty in his behalf, against his protestations; to which ruling of the court the prisoner excepted."

The deceased was the overseer of a plantation in Dallas county, belonging to Mr. Vasser, who was also the owner of the prisoner; and was shot on the 26th July, 1858, about 9 o'clock at night, as he was riding from the house of his employer to the plantation, and died on the next morning. At that time the prisoner was run away, but he voluntarily returned to his master about a week afterwards. After proving the dying declarations of the deceased, as to the circumstances attending the shooting, " the State introduced as a witness one Hardy, a slave, the property of one Walker, who testified, that on the night said Oaks was killed, Mose came to him, near his (Hardy's) master's, having a gun, and told him that he had shot Oaks that night with said gun—that he had loaded it with fifteen buckshot, a rifle-ball, and a slug, and that the other barrel was loaded in the same way. The State also offered one Jennings as a witness, who testified, that about one month after the death of the deceased, while Mose was confined at Pleasant Hill, in Dallas county, he went to see him, between ten and twelve o'clock on Monday morning, at the instance of said Mose; that he found Mose confined in a little room back of a grocery, with a chain passing around his neck by one end, and the other

end fastened to the house, handcuffed, and perhaps other-
wise secured; that on entering the said room, he said,
'Well, Mose, what do you want with me;' and that Mose
replied, 'Mass Edmund, I have known you a long time;
we are members of the same church. You examined me
very closely on the other trial, I then told you a lie; I
now want to talk to you as a church member.' Said wit-
ness stated, also, that he knew of no promises or threats
made to the prisoner. The State then offered to prove,
that the prisoner then made confessions of his guilt to
said Jennings. The prisoner objected, and insisted that
said confessions were not shown to be voluntary. The
court overruled said objection, and held said confessions,
*prima facie*, voluntary and admissible, (the above being
all the evidence on the point;) to which ruling the defend-
ant excepted. The prisoner then offered to prove, that
the confessions to said Jennings were not voluntary, but
were illegally obtained, and were inadmissible; and the
court decided to hear said evidence before hearing said
confessions. The prisoner then asked the court to direct
the jury to withdraw, so that they might not hear the pre-
liminary examination aforesaid for the above purpose;
but the court refused to do this, and the prisoner ex-
cepted."

"To show that the confessions to said Jennings were
not voluntarily made, the prisoner then proved to the
court the following facts and circumstances: When the
prisoner, who was a runaway at the time said Oaks was
killed, returned to his master on the eighth day afterwards,
his master cursed him, struck him in the face with his
fist, and made it bleed; told him that he believed he had
shot Oaks, and that he was going to send him to the vigi-
lance committee; that he hoped they would hang him,
and that he should never see him again; and then bound
him securely with cords, and sent him to said committee
at Pleasant Hill, which was their head-quarters. Said
committee examined and discharged him, and he returned
to his master's that evening. His master, still believing
that he was guilty, kept him chained the balance of the
week; and, after keeping him so confined for several days,

Mose (a slave) v. The State.

stripped him while tied, cursed him, and told him that he would make him tell about the murder of Oaks, or kill him. The prisoner denied the charge, and insisted that he was innocent, and, at length, so satisfied his master of his innocence, that, after striking him once or twice with a whip, and seeing that he was badly frightened, he let him go, and sent him down to the plantation. Afterwards, when he had been at work about a week on said plantation, his master had another interview with him, and, in order (as he testified) to induce him to tell what he knew about the murder of said Oaks, told him, that if he would tell him all about the killing of said Oaks, he would run him off, and he should never be hurt for any part he took in it; but the prisoner again denied that he knew anything about it, or had any part in killing said Oaks. After the prisoner had been at work on said plantation for two or three weeks, one Riggs went to the plantation to arrest him; walked up to him on Sunday afternoon, laid his hand on him, and said, 'You are the boy I am after. Walker's boy has been taken, and the murderer of Oaks has been found out.' The prisoner then again denied that he had killed Oaks. Riggs then carried him to his master's residence. His master, being very much excited, on account of having heard that Hardy had confessed that the prisoner had killed said Oaks, then cursed him again, and told him that he believed he was guilty of said crime, and that he and Hardy were both guilty; that he was going to send him again to the vigilance committee, and hoped that they would hang or burn him; that he would give $200 to have him hung; that he would hang him, and Hardy too, before the night after the next day; that he would hang him himself, if nobody else would, if he was proved guilty; and that he need not look for or expect any further assistance or protection from him. While his master was thus talking to him, the prisoner was securely tied, and had his arms pinioned to his sides; and he was carried to Pleasant Hill the same evening, and delivered to the vigilance committee, who took charge of him, and kept him in the bar-room of the hotel that night; several of the committee staying with

him to guard him. He was fastened with a chain around his neck, had on handcuffs, and was tied with a rope. Many persons talked with him that night, and asked him a great many questions; but about what, the witness could not say. The persons who so interrogated him, passed in and out, and asked him such questions as they thought proper to ask. On the next morning, the prisoner was carried from the hotel to a room back of a grocery in the village, where he was kept confined in the same manner; and many persons there continued to interrogate him, passing in and out, and asking such questions as they pleased. One Thomas B. Somerville testified, that threats of violence were used towards him while confined at Pleasant Hill, in charge of said Somerville, before any confessions were made by him; that the prisoner knew such threats were made before said time; that he (witness) told him he ought to be hung, and that there were men then engaged in trying to make up money to pay for him, and hang him right there, without judge or jury; that he also told him, 'Mose, you are in my charge, and I will treat you as well as I can while you are;' and that all this occurred before any confession was made.

"One Carson was then introduced, and testified, that he and Mr. Rives, having been sent for by Mose, went to see him about eight o'clock on Monday morning; that Mose then appeared to be much distressed and wearied, and said to them, 'that he felt badly, and was tired—please to fix a place for him to rest, that he wanted to sleep a little, so that he could compose his mind; and to return in about an hour, as he wanted to talk to them, and to let no other person come with them.' Witness and Rives then retired from the room, closed the door, and went off. When they returned, about an hour afterwards, and re-entered the room, Mose roused up, and appeared to have been asleep. One of them asked him how he felt; to which he replied, that he felt better. One of them then asked him, if he was ready to talk to them now; and he replied, that he was. One of them then asked him, what he had to say; and Mose then asked him, if there was any chance for a man who had committed murder to get to

Mose (a slave). v. The State.

heaven; to which one of them replied, that he did not know—there might be mercy, but he would have to repent. Mose then said, that he had done a great deal of hard praying, and did not want to miss heaven. Carson then told him, to be particular not to tell anything against himself; that so far as he was concerned, they were satisfied. Mose then asked them, if it would be any harm for them to tell him what the man had witnessed against him; and Carson said, they would not tell him. . Mose was then silent for a while, when Carson said to him, 'Well, Mose, as you seem to have nothing to tell on any body else, you must be the guilty one;' and, as Carson testified, Mose then went on to make his confession. On cross-examination of said Carson by the State, the counsel for the State insisted, that the confession itself would show that it was voluntary, and asked the witness to state the confession to the court for this purpose. The prisoner objected to said witness giving said confessions in evidence for this purpose; the court overruled the objection, and the prisoner excepted. Under this ruling of the court, said Carson then stated, that Mose said, in answer to his remark last above mentioned, 'It is a certain matter that I shot Mr. Oaks;' and, in answer to questions asked him, then went on to state, that he shot him from the inside of the fence corner, on the way from his master's house to the plantation, on Sunday night; that Oaks was not more than six or seven feet from him when he shot; that he had a double-barreled gun, but did not shoot the second barrel, because the gun kicked him on the nose, and confused him so that he could not do it; that he followed on after Oaks until he got close to the house on the plantation, when one of the negroes on the place, named Rocko, came to him, and asked if it was he that had shot Mr. Oaks; that he told him it was, and Rocko said he thought so; that he had waylaid Mr. Oaks at the same place, on Sunday night two weeks before, but did not shoot because Mr. King was with him; that he also waylaid him once in a ditch in the field, but did not shoot him then because his master was with him; that no person was with him on the night he shot the deceased; that

he got with the boy Hardy that night, and stayed with him next day around Shiloh church; that they went to Selma on the next (Monday) night, and stayed about there until Wednesday, when they came back; that on Thursday morning they met with Dr. Townsend's Will, who told them that Mr. Oaks was dead; that when he came home to his master Hardy had the gun; that he saw Hardy the next week afterwards, and got the gun from him, to prevent Hardy from killing his own overseer with it, as he said he intended to do, and hid it, with some shot and powder, in a chesnut log between his master's field and Mr. Walker's; and that he killed the deceased because he was a hard down man on him, and said he was going to be harder. Carson and Jennings both testified, that the prisoner made no allusion, in his confessions to them, to the threats or promises previously made to him by his master. Carson stated, that he, Rives and Mose were all members of the same church. It was proved, that the confessions to Carson and Rives were made before the confessions to Jennings. Major Vasser, the owner of Mose, further testified, that he was a very timid negro, and had been from childhood; that when brought out for trial on Tuesday after his arrest by said Riggs, and after the confessions made to Jennings and Carson, he (witness) was present, and heard many threats made against Mose, in his (Mose's) hearing, to the effect that the people at Pleasant Hill would hang him there, and that a purse would be made up to pay for him; that it was in fact agreed between said Vasser and others, that both Mose and Hardy, then being present, should be taken to the place where Oaks was killed, and there burned; and that Mose was so greatly alarmed that he could hear his heart beat seven or eight feet distant.

This was all the evidence introduced, on either side, showing the circumstances under which the prisoner's confessions were made. The prisoner thereupon insisted, before the court, that the same were not voluntary, and should not be allowed to go before the jury as evidence; but the court overruled the objection, and held such confessions to be admissible evidence; to which the prisoner

excepted. The prisoner's said confessions, as made to the witness Carson, were then introduced in evidence to the jury, against the prisoner's objection; and he excepted to the ruling of the court in allowing them. The State then offered to prove, that on the same day, but subsequent to the time testified to by said Carson, the prisoner made another confession to the witness Jennings. To this the prisoner objected; the court overruled his objection, and he excepted. Said Jennings then testified, that having gone to see Mose, on being sent for by him, on said Monday, Mose told him, that he had sent for him because they were members of the same church, and because he had told him lies when first questioned by him before the vigilance committee—that he had told him he had not killed Mr. Oaks, when he had; that he had also told him he had skinned his nose in falling down a bluff, which was not true, as his nose was in fact hurt by the kicking of the gun when he shot Mr. Oaks; also, that he had waylaid Mr. Oaks at the same place, on Sunday night two weeks before, and would then have shot him if Mr. King had not been along with him. The prisoner objected to these confessions as evidence, because obtained under the influence of the first confession, and because not voluntary, and moved to exclude the same from the jury; but the court overruled the motion, and the prisoner excepted.

" One Wiley then testified, that on said Monday, at Pleasant Hill, Mose told him where said gun was, and that there was powder and shot with it. One Quarles testified, that about one month after Oaks was killed, he and another person found one buckshot in a pine tree about thirty-five feet from where Oaks was killed, and very nearly in the range of a gun, if shot from the corner of the fence above mentioned, at a man six or seven paces from it going in the road towards the houses on the plantation; and that he cut out the chip containing it, which he exhibited to the court and jury. To all this testimony of said Quarles the prisoner objected, and moved the court to exclude it from the jury; but the court overruled the motion, and the prisoner excepted.

The prisoner offered evidence of his own good character, and also evidence impeaching the general character of the witness Hardy, showing it to be bad, and contradicting sundry statements made by him. The State then introduced John Wiley as a witness, and asked him, whether he was acquainted with Hardy's general character for truth and veracity in the neighborhood where he resided and was known. The witness answered, that he did not know Hardy's character in the neighborhood, but knew his character in the family in which he (Hardy) lived; and, when asked the size of said family, replied, that it consisted of some eight or ten whites and about fifty blacks. The counsel for the State then asked him, whether said character was good or bad; and the witness answered, that his character in said family was good. To this question and answer, each, the prisoner objected, and excepted to their allowance by the court. One Buster was also called as a witness to the character of said Hardy, and testified, on his direct examination, that he was acquainted with said Hardy's general character for truth and veracity among his neighbors; that it was good, and that he would believe him on oath. Said witness testified on cross-examination, that what he meant by general character was the way he conducted himself, what his own master said, and what he knew of him himself. The prisoner then moved the court to exclude the direct testimony of said witness from the jury, on the ground that he was not competent or qualified to speak of Hardy's character; but the court overruled the motion, and the prisoner excepted.

"The court charged the jury, among other things: 1. That every one charged with the commission of an offense against the law, is presumed innocent until his guilt is established by the evidence; and that the prisoner, though a slave, was as much entitled to the benefit of that presumption as if he were a white man. 2. That unless the evidence was so convincing as to satisfy their minds of the prisoner's guilt beyond all reasonable doubt, they must return a verdict of not guilty. 3. That if, in view of all the facts and circumstances proved, they entertained

Mose (a slave) v. The State.

a reasonable doubt as to the truth of the confessions, they may disregard them in their decision of the case, as being incredible, although they cannot reject them as incompetent; and if they entertained no such reasonable doubt, they ought not to disregard them, although they may believe that said confessions were obtained by the appliances of hope or fear to the prisoner's mind.

"The prisoner asked the court to charge the jury—

"1. That if the the deceased was killed in Dallas county, then they must find the prisoner not guilty.

"2. That if they find there is no evidence of the fact that the prisoner shot the deceased, except his own confessions; and that his confessions to Carson and Jennings were made when he was confined and chained at Pleasant Hill, fifteen or more hours after his arrest, and after he had made the request of Carson and Rives to be left alone for one hour and then he would talk with them, and after his master had made the promises and threats testified to by him, and after the threats at Pleasant Hill testified to by the witness Somerville, and after what said Somerville had said to him,—then they would not be authorized to find the prisoner guilty on the confessions made to Hardy, unless they believed said Hardy to be worthy of credit.

"3. That unless the evidence against the prisoner should be such as to exclude to a moral certainty every supposition but that of his guilt of the offense imputed to him, then they must find him not guilty.

"4 That unless the evidence against the prisoner should be such as to exclude to a moral certainty every hypothesis but that of his guilt of the offense imputed to him, they must find him not guilty.

"5. That unless the evidence against the prisoner should be such as to exclude to a moral certainty every possible hypothesis but that of his guilt of the offense imputed to him, they must find him not guilty.

"6. That if they should find that there is no evidence of the fact that the prisoner killed the deceased, except his own confessions, then they should find him not guilty.

"The court refused each one of these charges, and the prisoner excepted to the refusal of each."

Mose (a slave) v. The State.

I. W. GARROTT, for the prisoner.—1. The prisoner had the right to be tried on his own plea of not guilty, interposed at the time of his arraignment, and the court erred in putting in another plea for him. Section 3574 of the Code has no application to the case, because the prisoner had pleaded when arraigned. Injury must be presumed from this error, since the record does not show enough to repel the presumption.—Spivey v. McGehee, 21 Ala. 417 ; Sackett & Shelton v. McCord, 23 Ala. 851; Hines v. Trantham, 27 Ala. 359; Thomas v. DeGraffenried, 27 Ala. 651.

2. The witness Jennings found the prisoner confined in a house, handcuffed, and with a chain around his neck; and his confessions while in that condition, without inquiry as to the treatment to which he had previously been subjected, or as to the promises or inducements which had been held out to him, were held to be *prima facie* admissible. That this was erroneous, see Brister v. The State, 26 Ala. 107; Wyatt v. The State, 25 Ala. 12; 1 Green. Ev. § 219.

3. The court should have directed the jury to retire while it heard the evidence preliminary to the admission of the confessions. No mind, however well trained, can hear a detailed statement of facts, without retaining impressions made on it; and it is not to be expected that jurors will be free from this infirmity.—Smith v. The State, 9 Humph. 17, 18; Florey v. Florey, 24 Ala. 247; Carlisle v. Hunley, 15 Ala. 625–6.

4. The prisoner's confessions were not competent evidence, under the facts disclosed in the record. It is shown that his master had at first attempted to compel him to confess by threats and punishment; that he then changed his tactics, and endeavored to procure confessions by bribes and promises ; that the prisoner was then arrested, and delivered to the vigilance committee, chained and handcuffed ; and that he was kept in this condition until the next day, when nature was exhausted, and the confessions were at last obtained. Is it remarkable that, circumstanced as he was,—abandoned by his master and

Mose (a slave) v. The State.

only protector, and in the power and custody of an infuriated mob, who were thirsting for his blood,—he gave way to his hopes or fears, and made the confessions which secured his conviction? As to the admissibility of evidence thus obtained, see 2 Russell on Crimes, 826–28; Roscoe's Cr. Ev. 39–40; 1 Greenl. Ev. § 220; Bob v. The State, 32 Ala 566–8; Wyatt v. The State, 25 Ala. 9; Brister v. The State, 26 Ala. 107.

5. The confessions to Rives and Carson having been improperly obtained, the subsequent confessions to Jennings, made on the same day, were also inadmissible. Authorities *supra.*

6. The testimony of Quarles was irrelevant. It is not the fact that a thing is found as confessed by the prisoner, but his knowledge of the existence of the fact, that tends to show guilt.—1 Greenl. Ev. §§ 231–32.

7. The testimony of Wiley and Buster, as to the prisoner's character, was illegal.—1 Greenl. Ev. § 461; 1 Phil. Ev. 212, 491; 2 C. & H. Notes, 767; Dave v. The State, 22 Ala. 23.

8. The statute authorizing a change of venue, does not include slaves. Section 3612 requires a payment in money, with which a slave cannot comply. Section 3305 is a legislative construction of statutes, showing that they do not generally include slaves. See, also, Eskridge v. The State, 25 Ala. 33; Cobb on Slavery, §§ 91–94.

9. Confessions are not, of themselves, sufficient to authorize a conviction; there must be, at least, additional proof of the *corpus delicti.* The 2d and 6th charges asked, should have been given.

10. The 3d and 4th charges asked, asserted clear legal propositions.—Best on Presumptions, (47 L. L.) 168, § 210; State v. Murphy, 6 Ala. 852; Mickle v. The State, 27 Ala. 20; 3 Greenl. Ev. § 29.

GEO. W. GAYLE, with M. A. BALDWIN, Attorney-General, *contra.*—1. The constitution of Alabama secures to every accused person "a fair and impartial trial."—Art. I, § 10 Section 3319 of the Code provides, that slaves shall be tried "in the *mode* provided by law for the trial

of white persons." Section 3608 secures to "any person," indicted on a criminal charge, the right to a change of venue. When a slave is charged with a crime, he loses the character of a chattel, and is viewed as a person.—Federalist, No. 54. A slave cannot be twice put in jeopardy, because he is a person.—Ex parte Brown, 2 Bailey, 323. An indictment lies for the murder of a slave, as a person, at common law.—2 Hawk. 454; State v. Flanagan, 5 Ala. 477; State v. Jones, 5 Ala. 666. A slave, when in jail, is entitled to a list of the jury and a copy of the indictment, as a person.—State v. Brister, 26 Ala. 107; Code, § 3576. In Louisiana, slaves are embraced in the general law.—12 La. (Ann.) 805. In North Carolina, slaves are held to be embraced in the general law as to protection, but not as to punishment.—Busbee's R. 214. Even if the change of venue was illegal, it cannot work a reversal of the judgment.—Porter v. The State, 5 Mo. 538.

2. The interposition of the plea of not guilty by the court, was authorized by the statute, (Code, § 3574;) and, even if unauthorized, could not possibly have prejudiced the prisoner.

3. No authority is cited for the position, that the jury should have been sent out during the preliminary investigation touching the admissibility of the confessions; and the uniform practice, in this State and elsewhere, has been to the contrary.

4. The admissibility of the prisoner's confessions, made and corroborated as they were, is fully sustained by the following authorities: Brister's case, 26 Ala. 107; State v. Long, 1 Hayw. 455; State v. Potter, 18 Conn. 166; Commonwealth v. Dillon, 4 Dallas, 111; Rex v. Gibbons, 11 E. C. L. 327; 1 Greenl. Ev. §§ 219, 229, 231; Wharton's Criminal Law, 317–18–19–20.

5. The mode of impeaching the slave Hardy was correct, if not the only proper mode. The whole spirit of our legislation confines the character of a slave to his owner and fellow servants, and, as a general rule, he can have no general character outside of his home.

6. It is not necessary to a conviction, that every other

Mose (a slave) v. The State.

·hypothesis should be excluded to a "moral certainty,"— which implies more than a reasonable doubt.—Mickle v. The State, 27 Ala. 20; 1 Starkie's Ev. (m. pp.) 414-15, 514.

A. J. WALKER, C. J.—The prisoner was arraigned, and pleaded "not guilty," at the term of the court at which he was indicted. Upon his last trial, he stood mute; and the court caused the plea of not guilty to be entered, against the objection of his counsel. In this there was no reversible error. It is not conceivable that the prisoner could have sustained the slightest detriment from the course adopted by the court.

[2.] We cannot sustain the position, that the statute does not authorize a change of venue in the case of a slave prosecuted by an indictment. The statute provides, that "the trial of any person, charged with an indictable offense, may be removed to another county, on the application of the defendant, duly supported by affidavit." A slave is a person, in the eye of the criminal law, and, when indicted, is clearly within the language of the statute. There was, therefore, no error in the refusal of the first charge.

[3.] The law undoubtedly requires, that a confession should be shown, *prima facie*, to have been voluntary, before it is admitted in evidence to the jury.—Brister v. The State, 26 Ala. 128; Wyatt v. State, 25 Ala. 12; 1 Phil. on Ev. (edition of 1859,) 542; 1 Greenl. on Ev. § 219; Regina v. Warringham, 2 Leading Criminal Cases, 167; 2 East's Cr. Law, 567. This is usually shown by negative answers to the questions, "whether the prisoner had been told that it would be better for him to confess, or worse for him if he did not confess; or whether language to that effect had been addressed to him."—Wyatt v. State, *supra*. Before the court·decided to admit the confession made to Jennings, the witness stated, that he visited the prisoner at his instance; that he addressed to the prisoner the question, "what do you want with me?"—that the prisoner replied, "I have known you a long time; we are members of the same church. You examined me very

closely on the other trial. I then told you a lie; I now
want to talk to you as a church member;" and that he
(the witness) knew of no promises or threats made to the
prisoner. Upon this preliminary proof, the court cor-
rectly ruled, that the State might proceed with proof of
the disclosure made to the witness. There was a substan-
tial, though not a literal compliance with the rule, as to
the proper inquiry preliminary to the admission of the
confession. It appeared, *prima facie*, that the confession
was voluntary.

[4.] After the court ruled that the confession was, upon
the evidence adduced for the prosecution, admissible,
the prisoner produced witnesses, with a view of showing
that the confessions made to the witness Jennings,
and also to Carson, were not voluntary. After hearing
the evidence, which is set out in the bill of exceptions,
the court admitted the confessions made separately to the
two witnesses. We are now to inquire whether the
court erred in its ruling. The master of the prisoner,
some weeks before the confession, made a promise of
favor and protection, if the prisoner would disclose *to
him*. The slave made no disclosure, but protested his
innocence. Subsequently, the master, on hearing of a
disclosure made by another slave, told the prisoner, that
he believed him guilty; that he wished him to be hung;
that he would give two hundred dollars to have him hung;
and that the prisoner need not expect any further assist-
ance or protection from him. On the next day, the
confessions were made separately to the witnesses Carson
and Jennings. The question arises, whether or not these
confessions were induced by the master's promises of favor,
made some time before.

It is a rule of great strictness, that if a confession has
once been obtained by undue means, no subsequent con-
fessions of like character are evidence, unless it is shown
that the influence has been removed.—Bob v. The State,
32 Ala. 560. This rule would be applicable, and might
have a controlling influence, if the slave had yielded to
his master's inducement, and made a confession to the
master. The question is, however, not whether an in-

ducement, which produced a confession upon the occasion of its offer, is the parent of a second confession; but, whether an inducement, which had no effect at the time when it was made, was the cause of a confession made some weeks afterwards. The promise of the master was put upon the condition of a disclosure to *him*. The favor promised was, that the master would run the slave out of the country, and sell him. The master's ability to fulfill that promise depended, in a great measure, if not entirely, upon the confessions being made privately to the master, before the law had taken him into its custody. It may, therefore, well be doubted, whether the master's promise could have been understood to extend to a future confession, made to some other person. The slave, however, resisted the inducement, when offered by his master, who had authority over him, to whom he was accustomed to look for protection, and who had, in all probability, the ability at the time to execute the promise. Is it probable, that the inducement, which was ineffectual when offered under such circumstances, acquired several weeks afterwards such an influence, as to superinduce a confession to a person other than the master, when the prisoner had been taken into custody, and the master's ability to comply with the promise was greatly lessened, if not altogether destroyed? We do not pause to answer this question; for, if we could conceive it possible that a slight influence produced by the master's promise lingered in the slave's mind, and was liable to produce a confession, we should be bound to regard that influence as totally removed by the forcible admonition of the master, that he need not expect any further assistance or protection from him; that he believed him guilty, and desired him to be hung. Looking at the subject in every aspect, we think the court below was entirely safe in assuming, that no influence exerted by the promise of the prisoner's master caused the confessions which were made.—Moore's case, 2 Leigh, 701; State v. Guild, 5 Hals. 163. The principle is, that although a threat or promise may have been made use of, the confession is to be received, if it has been made under such circumstances as to create a reasonable

presumption that the threat or promise had no influence, or had ceased to have influence upon the mind of the party.—Roscoe's Crim. Ev. 42; 1 Greenl. on Ev. § 221; Brister v. State, 26 Ala. 129.

To the argument that the confessions were promised in order to procure an opportunity to sleep, and afterwards made in fulfillment of that promise, we cannot assent. The testimony very clearly shows that the prisoner sent for the witness Carson; that he asked an opportunity to sleep, in order that he might compose his mind; and that he voluntarily requested the witness to return in an hour, in order that he might talk with him. The opportunity of sleeping was not afforded upon condition that he would confess, but was asked because, in the perturbed and distressed state of his mind, the prisoner needed the composure which sleep would bring to fit him for the interview which he desired.

There was nothing said by either of the witnesses, Carson or Jennings, calculated to produce upon the prisoner's mind the belief that it would either be worse for him to withhold his confession, or better for him to make it. His confessions seem to have been prompted by a sense of religious duty, awakened by the apprehension of a speedy execution at the hands of lawless violence, and were not the result of the slightest hope of temporal benefit on account of the confessions. We decide, therefore, that the court below committed no error in admitting in evidence the confessions made to the witnesses Carson and Jennings.

[5.] Before the court went into the preliminary examination for the purpose of ascertaining whether the confessions were voluntary, the prisoner's counsel moved the court to cause the jury to withdraw pending the examination, lest they might be so affected by the evidence detailed on the preliminary examination, that the impression could not be removed if the evidence was excluded. The court refused to cause the jury to retire, and the prisoner excepted. As the confessions were admissible, the prisoner could have sustained no injury from the fact that the jury was present during the preliminary investi-

gation ; and we could not reverse, even though the court had erred in that respect. We deem it proper, however, to say, that the court committed no error in refusing to cause the jury to retire, as was requested. There is no rule of law, which requires that inquiries as to the admissibility of evidence should be conducted apart from the jury; and we can perceive no adequate reason why we should inaugurate such a rule. We can not presume that jurors are incompetent to banish from their minds the effect of those things which may happen to be heard by them in such examinations, and which are not admitted as evidence for their consideration. We do not act upon that presumption. It is settled that no reversible error is committed by the admission of illegal evidence, if it be afterwards withdrawn.—Frierson v. Frierson, 21 Ala. 549; Bilberry v. Mobley, *ib.* 277. The propriety of conducting such examinations apart from the jury, must be left to the discretion of the presiding judge. There may occur cases where such a course would be necessary, in order to accomplish the ends of justice. When such a case occurs, an appeal must be made to the enlightened discretion of the circuit judge.

[6.] The evidence of the witness Quarles was admissible. It was pertinent to the question of the correctness of the declarations of the deceased, and of the confessions of the accused; and for that reason, if for no other, it was competent testimony in the cause.

[7.] The witness Wiley stated, that he knew the character of the witness Hardy in the family to which he belonged, and that the family consisted of eight or ten whites, and about fifty blacks; but he stated, that he did not know his character in the community. The court permitted the character in such family to be given in evidence, and that ruling is assigned for error. It is true that the repute in the neighborhood is usually laid down in the law-books as the test of the general character which may be given in evidence; but the inquiry is not to be confined to the repute among those who, on account of propinquity of residence, are neighbors in the common acceptation of the term. The term *neighborhood* is said,

in a Pennsylvania case, to be co-extensive with the inter-
course of the witness.—Chess v. Chess, 1 Penn. R. 40.
This court, in discussing the qualification of a witness to
testify as to character, decided, that he must be able to
state what is the general repute of the person with those
among whom he dwells, or with whom he is chiefly con-
versant.—Sorrelle v. Craig, 9 Ala. 534; Hadjo v. Gooden,
13 Ala. 718. Again, this court said, that the question
should be, whether the witness knows the general charac-
ter among his neighbors, or *those acquainted with him.*
Dave v. State, 22 Ala. 23. Eight or ten whites and fifty
slaves, congregated together, form quite a community.
A wholesome discipline requires that the slaves should be
kept chiefly at home; and the intercourse of the slave
outside such community is, in many cases, rare, and for a
very short time. It may frequently happen, therefore,
that the slave has no character outside of the community
to which he specially belongs. His character in a family
or community, such as that above mentioned, is not a
reputation with a few persons : it is a general character,
and often the only character which the slave has. We
think a slave's general character in such a community is
admissible in evidence. Such a character will frequently
be as extensive as the slave's intercourse, and will be his
reputation with those who are chiefly conversant with
him. There was no error in admitting the evidence of
the witness Wiley.

[8.] The evidence of Buster, as to character, ought to
have been excluded. He showed by his answer on cross-
examination, that his estimate of Hardy's character was
not based upon his general repute among his neighbors,
or those acquainted with him.—Dave v. State, 22 Ala. 38;
Hadjo v. Gooden, 13 Ala. 718; Wike v. Lightner, 11 S.
& R. 199–200.

[9.] The court below erred in refusing to give the third
and fourth charges asked, which are substantially the
same.—Best on Presumptions, 282, § 210; Starkie on
Ev. (edition of 1860,) 759, marg. 862; Mickle v. State,
27 Ala. 20; State v. Murphy, 6 Ala. 845; Harrington
v. State, at the present term; State v. Newman, 7 Ala.·

Mose (a slave) v. The State.

69; State v. Marler, 2 Ala. 43. By moral certainty, we understand to have been meant, that kind of certainty which is distinguished from physical or mathematical certainty—which controls and decides the conduct of men in the highest and most important affairs, where the guidance of the senses or of mathematical calcu- lations cannot be had. We think, too, that the context of the third charge requested shows that the word *sup- position* in that charge was not used in the sense of imagination, or to designate an operation of the mind, but points to something supposed; and that the word *supposition*, in the third charge, is not distinguishable from the word *hypothesis* in the fourth charge, in the office which it performs. Thus understood, the third charge is, in substance, the same with the fourth; and they both assert nothing more than the proposition, that the jury must from the evidence be convinced to a moral certainty of the defendant's guilt, in order that they may return a ver- dict against the accused. Unless the jury are *morally* certain of the defendant's guilt, it cannot be said that they have no reasonable doubt of his guilt. The propo- sition, therefore, that the jury must be convinced to a moral certainty of the defendant's guilt, is substantially the same with the proposition, that they must be so convinced beyond a reasonable doubt.

[10.] The fifth charge requested, was properly refused. The jury ought not to be instructed, that they must acquit, if there is any other " possible hypothesis " than that of the defendant's guilt. A doubt which requires an acquittal, must be " actual and substantial, not mere possibility, or speculation." It is not a mere possible doubt, because everything relating to human affairs, and depending upon moral evidence, is open to some possible or imaginary doubt. It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of the jury in that condition, that they cannot say they feel an abiding conviction to a moral certainty of the charge.—Webster's case, 5 Cush. 320.

[11.] The *corpus delicti* being otherwise established, a

conviction may be had upon confessions alone, if they
were free and voluntary, and satisfactorily proved.—
Wharton's Am. Crim. Law, § 683.

The judgment of the court below is reversed, and the
cause remanded; and the prisoner must remain in cus-
tody, until discharged by due course of law.