## CHARLES SHEPHERD v. STATE OF NEBRASKA.

[FILED FEBRUARY 17, 1891.]

1. **Confessions:** THE PRELIMINARY EXAMINATION before the court to ascertain whether or not a confession of a prisoner offered in evidence is voluntary, is properly conducted in the hearing of the jury.

2. ———: ADMISSIBILITY: DETERMINATION. After a confession is given in evidence it is for the jury to determine from all the facts and circumstances proven on the trial, in connection with the confession, whether it was voluntary and what credit should be given it.

3. ———: ———. *Held*, That the confessions proven on trial were voluntary, and properly received in evidence.

4. **The remarks of the judge** in passing upon an objection made

by the defendant to the introduction of certain testimony, exam-
ined and considered, and *held*, not prejudicial to the accused.

5. **Instructions.** It is not error to refuse an instruction the sub-
stance of which has already been given.

6. **Evidence,** *held*, to sustain the verdict of murder in the first
degree.

ERROR to the district court for Dodge county. Tried
below before MARSHALL, J.

*T. M. Franse*, for plaintiff in error:

The judge must decide on the admissibility of evidence.
This often involves an inquiry into facts, and when it does,
he alone determines it, the jury taking no part therein, and
having no power to revise his findings. (*Washington v.
State*, 53 Ala., 29; *Miller v. State*, 40 Id., 54; *State v. Fid-
ment*, 35 Ia., 541; *Nicholson v. State*, 38 Md., 140; *Peo-
ple v. Ah How*, 34 Cal., 218; *Wallace v. State*, 28 Ark.,
531; *People v. Ivey*, 49 Cal., 56; *Boyd v. State*, 2 Humph.
[Tenn.], 39; *U. S. v. Gilbert*, 2 Sumner [U. S.], 19; *Bris-
ter v. State*, 26 Ala., 107; *Corbett v. State*, 31 Ala., 329;
*Levy v. State*, 49 Id., 390; *Banks v. State*, 42 Ga., 544;
*Seaborn v. State*, 20 Ala., 15; *State v. Patterson*, 68 N.
Car., 292; *Morrison v. State*, 41 Tex., 516.) Modern
courts reject a confession whenever shown to have been
made under the expectation of bringing favor, by whomso-
ever induced. (*Simon v. State*, 5 Fla., 285; *State v. Potter*,
18 Conn., 166; *Spears v. State*, 2 O. St., 583; *Rex v.
Thomas*, 6 Car. & P. [Eng.], 353; *Rex v. Dunn*, 4 Id., 543.)
As to the remarks of the court: *Kersenbrock v. Martin*, 12
Neb., 376; *Markel v. Moudy*, 11 Id., 218; *Poine v. Kohl*,
14 Id., 581; *Marion v. State*, 20 Id., 244; *Horbach v.
Miller*, 4 Id., 43; *R. V. R. Co. v. Arnold*, 13 Id., 488. As
to the confessions: *Heldt v. State*, 20 Neb., 496; *Irwin v.
State*, 54 Ga., 39; *Bob v. State*, 32 Ala., 560; *Williams v.
State*, 35 Tex., 356; *Deathridge v. State*, 1 Sneed [Tenn.],
75; *Porter v. State*, 55 Ala., 95; *Beery v. U. S.*, 2 Col.,

186; *State v. Jones*, 54 Mo., 47᠎; *Dinah v. State*, 39 Ala., 359; *State v. Lowhorne*, 66 N. Car., 638; *State v. Clarissa*, 11 Ala., 57; *Com. v. Harman*, 4 Barr [Pa. St.], 269; Bishop, Crim. Proc., secs. 1234, 1236; *Spears v. State*, 2 O. St., 586; *Simon v. State*, 5 Fla., 285; *Rex v. Hall*, 2 Leach [Eng.], 559.

*William Leese, Attorney General*, and *Geo. L. Loomis, contra:*

The examination as to confessions should be conducted in the presence of the jury. (*Mose v. State*, 36 Ala., 211; *Holsenbake v. State*, 45 Ga., 43.) It is the province of the court, not of the jury, to determine the admissibility of evidence. (*Rufus v. State*, 25 O. St., 464; *Com. v. Culur*, 126 Mass., 464; *Fife v. Com.*, 29 Pa. St., 429; *Memaka v. State*, 55 Ala., 47; *Runnels v. State*, 28 Ark., 121; *Wallace v. State*, Id., 531; *State v. Squires*, 48 N. H., 364.) The confession was admissible. (*U. S. v. Stone*, 8 Fed. Rep., 253; Whart., Crim. Ev., secs. 658, 686–7; *Com. v. Smith*, 119 Mass., 305; *Ballard v. State*, 19 Neb., 609; *Smith v. Com.*, 10 Gratt. [Va.], 40, 743; *State v. Patterson*, 73 Mo., 695, 702; *Rice v. State*, 22 Tex. App., 654; *State v. Staley*, 14 Minn., 105, 113; *Com. v. Tuckerman*, 10 Gray [Mass.], 173; *Com. v. Morey*, 1 Id., 461–2; *State v. Carrick*, 16 Nev., 120; *People v. Thomas*, 3 Park. Cr. Rep., 256; *Allen v. State*, 12 Tex. App., 190; *Roneycult v. State*, 8 Baxt. [Tenn.], 371; *Murphy v. People*, 63 N. Y., 590; Whart., Crim. Ev., sec. 662; *Dacy v. People*, 116 Ill., 555, 573.)

NORVAL, J.

The plaintiff in error, Charles Shepherd, at the January, 1890, term of the district court of Dodge county was jointly indicted with Christian Furst for the murder of Carlos True Pulsifer. A separate trial was had. The

plaintiff in error was convicted of murder in the first degree, and sentenced to be hanged.

On the trial the state, over the defendant's objection, proved several statements or confessions of guilt made by the accused. The first point made in the brief of the plaintiff in error is that the court erred in not excluding the jury from the court room during the preliminary hearing before the court to determine whether or not such confessions were voluntary. It is firmly settled that when a person arrested for a crime confesses his guilt, such confessions, if free and voluntary and not obtained through fear or from promise of favor, may be proven on the trial. The admissibility of confessions, like any other testimony, is for the court to determine, but when introduced the credit to be given them is for the jury to pass upon.

The importance of the jury hearing the preliminary examination had before the court to ascertain whether or not the confessions were voluntary is obvious. The ruling of the court that they were so made being only *prima facie*, the jury must ultimately pass upon the question, and, in determining the weight to be given confessions when introduced, the jury may properly consider all the facts and circumstances surrounding their making. (*Holsenbake v. State*, 45 Ga., 43; *Mose v. State*, 36 Ala., 211; *Rice v. State*, 47 Id., 38.)

The rule is that the jury should not be excluded during the determination of the question whether dying declarations are admissible. (*People v. Smith*, 104 N. Y., 491; *State v. Cain*, 20 West Va., 679; *State v. Wood*, 53 N. H., 484.) No good reason can be suggested why a different practice should prevail as to the admission of confessions.

Objection is made to the following language used by the trial judge in passing upon the defendant's objection to the witness King testifying to statements made to him by the prisoner:

"In view of the fact that the jury will ultimately pass

upon this question it is perhaps improper for the court to review the evidence, and the court will only announce the conclusion arrived at, and that is that it has not been shown that the statements made to the witness, if any, witness King was produced either by promise or favor or through threats; or in other words, that it was involuntary, but on the contrary that the evidence shows that the statements made to King were voluntary, and the objection to the witness King stating what the defendant had stated to him will be overruled."

We do not discover anything prejudicial to the accused in the remarks of the judge, nor was there any invasion of the province of the jury.    The weight and effect to be given the confessions of the defendant were properly left to the jury.    They could not have understood that they were not at liberty to find that they were involuntary.    The court by the 23d paragraph of the instructions left it to the jury to ascertain from the evidence whether or not the statements and confessions testified to by the witnesses as having been made by the defendant were his free and voluntary act.

It is next urged that the court erred in admitting the testimony of the witness, J. J. King, as to an alleged confession made by the defendant to the witness.    We quote the questions propounded to King, and his answers thereto:

Q. State whether or not, while the defendant Shepherd was in your store in the forenoon of December 12th, you had any conversation with him with reference to the hairs upon his pants, and the appearance of his pants that he had on at the time of his arrest.

A. I did.

Q. What was the conversation?

A. I came in and he was sitting on the counter and I walked up to him, I said Charlie this looks very suspicious —calling Charlie's attention to the condition of his pants.

Q. Go on.

A. Then he said, well, he said, we stole the horses, but we did not kill Carl Pulsifer.

Q. Go on, Mr. King.

A. I don't think that I said anything else, did not excuse or anything of the kind.

Q. At that time?

A. And then I said, where did you part with Chris, and and he says, I parted with him down the railroad; I said, which way did he go? he said, he went northwest across the country; I said, where did you go? he said, I went along the river and gathered up those traps.

Q. And what were the traps?

A. Gathered up the traps, he said he had the traps set out along the river and that he had set them out the Monday previous and had come up to Crowell going home and I asked him where he thought we would find Chris, and he said that we would find him near the bridge at the county line; there was a number standing around there and they went up there.

Q. Now state whether or not while you were still there that forenoon his satchel, Exhibit No. 7, was brought in by the party who found it.

A. Yes.

Q. I think you stated that you rode in a buggy with the defendant from Crowell to Scribner?

A. Yes, I did.

Q. Now what, if any, conversation did you have with him in the carriage on the way to Scribner with reference to this valise?

Q. I asked him which one of those hay stacks up there did he leave his satchel by. We had at this time got right along on the east side of the land where these hay stacks stood.

Q. Were you or not in sight of the hay stacks?

A. Yes.

Q. What did he say?

A. He said that is not my satchel, and I said Charlie you need not deny that satchel, I said I have seen you carry that too often heretofore; well, he said, I mean it is not mine, he said I just got it borrowed; then I said you do not deny carrying it heretofore, he said no; I asked him where he left it; he said up there, pointing on a hill to one of these stacks.

Q. By looking on this map could you state where the stacks stood that he referred to?

A. I think I could; we crossed right there and go down to here, go right to this section corner and then go right here. This road runs to that corner and then goes south, and the bridge is right here, and this whole side of section 15 is open and this satchel was amongst those stacks on the bluffs.

Q. That is the hay stack he indicated?

A. Yes, the satchel was right on the bluff, right there.

Q. Now, did you have any further conversation with him in reference to the Pulsifer murder or his connection with it on your way down to Scribner?

A. Not on our way down there; no.

Q. Having got to Scribner you have testified, I believe, that you and he were taken to a room in a hotel by the constable Jones and you left there with him?

A. Yes.

Q. Have you given us all the conversation with him at the time in reference to the satchel, either carrying it or where they left it?

A. I have not given it all.

Q. Go on.

A. He told me that they had taken the satchel with them the night of the murder as far as the prairie just before they got to Mr. Shoemaker's, and there they had left it. This was on Wednesday night; then Thursday night, after they had got the horses, they came back the same way and picked up this satchel and carried it off to that prairie

which is on section 9 down to this place and left it.    That
is all he told me about the satchel.

Q. Anything else at that time with reference to the way,
the course, they took the night of the murder, or with ref-
erence to the murder, that is, at that time?

A. Yes, sir.

Q. Go right on; give the conversation, just what was
said.

A. When we were in the room at the hotel Charlie laid
himself on the bed and rather despondently said he wished
he was dead.    I said, yes, Charlie, it is too bad; how did
you come to do it?    He said, I was talked into it.    I said,
I was sorry for you; you have got a good mother, I am
sorry for your mother.

Q. Go on, and detail just what was said.

A. Defendant said, yes I have got as good a mother as
ever lived and I feel sorry for her, and I asked him how
came they to do it.    He said he was talked and influenced
into it.    I said, Charlie you are too old and ought to have
judgment of your own and not be talked into such a thing.
And I said, you might as well tell me how you done it
and all about it.    He said, well, King, we would not have
killed Carl Pulsifer only we have to.    I said, have to! no
person has to take another person's life.    Well, he said, we
told him to throw up and he didn't do it and then Chris
Furst shot.    I said, did Chris do all the shooting, and he
said yes.    I asked him where this shooting took place, and
he said that he was at one end of the culvert and Chris
was at the other.    I asked Mr. Shepherd if it was not a
fact that they shot Mr. Pulsifer without giving him a min-
ute's warning.    He said, yes, Chris did; he said, he fired
two shots before we got out of the culvert and that did
not bring him, and then Chris fired the other two shots
and Mr. Pulsifer fell.    I asked him if Mr. Pulsifer did
not make any expression or beg for mercy and he said he
did not have time, he did not say a word; he fell with a

gurgle and Mr. Furst ran and turned him over and robbed him and kicked out the lantern and they both ran. I said, Charlie, this does not look reasonable; the shots were fired two at one time, with an intermission, and two the next time. I said, isn't it a fact, now, that you both shot? he said, yes, but we would not have done it if we didn't have to. I said, isn't it a fact that you both shot, and he said yes. And then I asked him how came they to go up there to do this, and he said that Chris had talked him into doing it. I said, Charlie, it don't look reasonable, because Chris was not acquainted with Pulsifer, to my knowledge, and I know you was before. He said, Chris was well acquainted with Pulsifer, better than you think. I said, was Chris ever up there before? Yes, he said, Chris was all over the ground and laying the plan. I said, you had it planned how you were going to do it. He said, yes, we did. He went on and related when they left Scribner.

Q. Tell what he said.

A. He said they left Scribner a little after noon and went up the track and hid in the brush near the river, and it was just before dark they crossed over the bridge and went on the east side of the river—that would throw them west, up the river—and hid in the brush there until just before dark, then they came out. I said, isn't it a fact that you came out by Hoppe's house? He said, yes. I said, isn't it a fact that when you got to Hoppe's and went west to a certain point by a pasture and then went north on a potato patch until you got directly west of the murder, and then went east? He said, yes, and stayed there until Pulsifer came. I said, how did you know it was Pulsifer? He said he had the lantern and we knew it was him. I said, you were used to Pulsifer and his habits—knew him? He said, yes. I asked, after you did the killing, you came back by Hoppe's? He said, yes, and that Mr. Hoppe came out and called the dog back. I asked him then which way they went after they left the

corpse.  He said we went straight west and crossed the railroad, across a little piece of meadow, and went right by the corner of the corn, then across the stubble southwest, and crossed the road that runs north and south, which is west of Hoppe's house, went into a piece of corn that lays west of the road about six rows, then went straight south in those rows of corn, came out at the south point of that corn right at Mr. Hoppe's house.  And I said, that is the time the dog got after you.  He said, yes.  I said, which way did you go then?  He said, we went straight south along the edge of the river, in the brush, across over the main wagon road bridge, followed the main road down until it turns west, then we went straight west on the main road and went by the school house over the mud street bridge upon the bluffs, and then angled across this prairie. And I said, didn't you then stop and buy a loaf of bread from Mr. Shoemaker after passing over this prairie?  He said, yes.  I said, which way did you go then?  He said, we went north; and when he was up there somewhere— he didn't know just where—he said, we heard a buggy coming and we crawled in under a culvert, and we were under the culvert when the team and buggy passed over it; after everything was still we came out and went north ; he said, after sun-up next morning we went into a farmer's house and ate our breakfast right at the table, and then we went and hid in the brush near the river bridge at West Point for awhile; then we came out and went into West Point in the afternoon; and he said, then I went to Dr. Summers and got this medicine (producing the medicine) in the afternoon ; he said, we went out of West Point and went back the same road we went in on and hid in a gulch until after dark; he said we had a team "spotted" and we tried to get it, but we didn't get that team, but we got another one; he said we got onto the horses and rode south and then went west; he didn't say how far, but he said Chris wanted to go back to Scribner after something,

which he supposed to be very valuable to Chris.   I asked him what it was.   He said he did not know, but said Chris said it was in the livery stable.   They came back on the road and turned south and came back near Mr. Shoemaker's, across this prairie, picked up this satchel, brought it back on the prairie, where they left it and rode into Scribner.

\*       \*       \*       \*       \*       \*       \*       \*

Q. Did he or not say anything in that conversation about having thrown away any books or anything, got any money or what they got?

A. I asked him what they had done with the pocket book; he said Chris told him that he threw it down back there in the weeds.   I said, which prairie; he said I don't know.   I told him that I would like to go and hunt for it, and for him to try and tell me on which prairie; well, he said, it was on or by Mary Moody's land or on this prairie just before we got to Shoemaker's.

Q. Did he say anything about any other book?

A. Well, I told him they had found a cash book and asked him then where they threw that down, and he said they threw it down west of the railroad somewhere after leaving the corpse.

Q. Did he or not say anything about how much money they got from Pulsifer?

A. I asked them how much money they got; he said he didn't know, but he did not think that Chris had given him all of it; he said, according to Chris's story, they only got about $20.

Q. Anything else during that conversation at that time that he said in reference to it?

A. Well he did say—I can call to mind now—that he had just learned the blacksmith trade, and he said I will either get my neck stretched or get a chance to learn another trade, and he asked me what I thought about it or what he should do; I said, Charlie, you use your own judgment about it.

Q. That was after the talk?

A. That was after the social talk, after the confession; shall I go on?

Q. No, not any social conversation between you after the confession, in regard to the murder. Now, have you told all that he said in reference to the shooting and the manner in which it was done?

A. Well, he first told me that Chris done the shooting, then, again, as I have testified, he said they had both done the shooting, and they wouldn't have done it if he had held up. I said, judging from the appearance of Mr. Pulsifer, he lay on his back so natural with the least expression, was it not a fact that they both shot Mr. Pulsifer without giving him a moment's warning—didn't you both shoot before you raised out of the culvert? He said, we did; and these two shots did not bring him and then we jumped up and shot, and at the third shot Mr. Pulsifer started to fall, and at the fourth shot he relaxed and fell right over. I asked him if he did not think that Mr. Pulsifer was really dead before he struck the ground; he said, I think he was, because he never spoke.

The testimony shows that the witness King was the owner of a store in the town of Crowell, near which the murder was committed, and that on the second day after the killing the defendant was arrested by King and taken into his store where he was kept an hour or two. The defendant was then taken by King in a buggy to the town of Scribner, two other persons accompanying them. They went to the hotel and obtained dinner, and in a room of the hotel the principal part of the confession was made, the defendant and King being alone in the room. We have carefully examined the testimony detailed by the various witnesses as to the circumstances surrounding the defendant at the time the confession was made by the defendant while in the store in Crowell, while going to Scribner, and in the room of the hotel, and we are fully convinced that neither

a threat nor a promise of a benefit or favor was made by King or any one else to the defendant to induce him to make the statements he did. The confessions were entirely voluntary and clearly admissible.

The same is likewise true of the confessions testified to by the witnesses James Mallon and George Bolus as having been made by the defendant while in the jail in the city of Fremont. It is true, at the time the defendant was put upon the cars at Scribner to be taken to Fremont, a large crowd of armed men was assembled at the depot and there was some talk of lynching the defendant. He was then considerably agitated and excited. It was some time after this, however, that the confessions were made in the jail. The prisoner was then in no danger of personal violence. There was no excitement or demonstration and he was not in the least frightened, but was perfectly composed. He talked freely and without the least hesitation. The confessions made to Mallon and Bolus were not induced either by hope or fear and no error was committed in receiving them in evidence.

The complaint was also made because the court refused to give the following instruction requested by the defendant: "A verdict of not guilty means no more than this, that the guilt of the accused has not been demonstrated in the precise, specific, and narrow forms prescribed by law. The evidence to convict the accused must not 'merely beyond all reasonable doubt be consistent with the hypothesis of his guilt, but it must be beyond all reasonable doubt inconsistent with any hypothesis of innocence that can be reasonably drawn therefrom."

The court on its own motion had instructed the jury that the defendant is presumed to be innocent of the crime charged, and that it was the duty of the jury to give him the benefit of this presumption and to acquit unless the evidence established his guilt beyond all reasonable doubt.

The jury were likewise instructed, in substance, at the

26

request of the defendant, that in order to draw an inference of guilt from the evidence, the existence of the inculpatory facts must be absolutely incompatible with the innocence of the accused upon any rational theory and incapable of explanation upon any other reasonable hypothesis than that of his guilt.

The substance of the defendant's request, which was refused, being covered by the charge of the court, it was not necessary to repeat it. The one requested was not more favorable to the accused than those given.

We are finally asked to reduce the sentence to imprisonment for life. The testimony shows that the deceased lived about a mile from the town of Crowell and had for several years been engaged in the coal, lumber, and grain business in the town and having no bank there he invariably carried his money with him. He usually walked home shortly after dark. The defendant and his accomplice, Furst, were familiar with his habits and customs in that regard. The deceased on December 10th, 1889, about dusk, started to walk from Crowell to his home carrying his lantern with him. When within about a quarter of a mile from his home, as he was crossing the track of the Fremont, Elkhorn & Missouri Valley railroad, he was shot and killed. The murderers proceeded to rob his body and immediately made their escape. John Pulsifer, a son of the deceased, was at his father's house and heard four shots fired in rapid succession in the vicinity of the railroad crossing, and looking in that direction saw the light in the lantern carried by his father immediately go out. The son started towards the crossing, and on reaching there found his father lying dead. Shepherd and Furst were seen in the vicinity of the place where the tragedy occurred, about dusk. Many of the statements contained in the confessions of the defendant were corroborated on the trial by testimony given by reliable witnesses. The evidence conclusively shows that Shepherd and Furst

killed the deceased. The motive for the murder was robbery. The evidence fully sustains the verdict of murder in the first degree. Under the testimony no other verdict could have properly been returned.

The judgment is

AFFIRMED.

THE other judges concur.